Jones vs. The State.

facts proven and undisputed, that the defendant had wholly failed to sustain his statutory title.

[3.] It was insisted by the counsel for the plaintiff below, and plaintiff in error here, that for the defendant to defeat the plaintiff by showing a paramount, outstanding title, he must go further, and connect himself with that title—equitably at least, if not legally.

This doctrine, it is true, has been again and again applied by this Court, to plaintiffs in ejectment, who lay a demise, in the name of some grantee who is not participating in the litigation. But the rule has never been extended to defendants. The possession of the defendant is a protection against all who seek to disturb it, until the true owner comes to assert his right. To him the defendant is answerable for mesne profits. And it is enough for him to show that the party suing is not the true owner, but that the paramount title is outstanding in another. This principle is hoary with age. We bow to it reverently.

THOMAS JONES, plaintiff in error, vs. THE STATE OF GEORGIA, defendant in error.

[1.] In an accusation of murder, where the defence turns upon the grading of the homicide, the Judge can not withhold from the consideration of the jury, any of the grades put in issue either by the argument or the requested charges, but all of the grades so put in issue, ought to be submitted to the jury, along with proper instructions, as to what constitutes each grade.

[2.] In grading the homicide, the jury may consider the drunkenness of the accused, at the time of the killing, not to excuse, or mitigate, or extenuate his crime, but to assist them in deciding, when there was a provocation, whether the intention to kill, preceded the provocation, or was produced by it.

Jones vs. The State.

Murder, in Richmond Superior Court. Tried before Judge Holt, at May Term, 1859.

The plaintiff in error, Thomas Jones, was indicted for the murder of William Osborne. At the trial, the following testimony was submitted on the part of the State :

Owen Gilfoyle, sworn : Was employed by the Augusta and Savannah Railroad Company last Christmas ; saw the difficulty between defendant and deceased, whose name was William Osborne ; it took place in Kahr's bar-room, which is opposite the Savannah depot, in the city of Augusta, county of Richmond, State of Georgia ; it was on the 25th of December, 1858, between ten and eleven o'clock in the morning. Went with William Osborne, the deceased, to the bar-room ; when we arrived there defendant and some one else, were making some noise behind the blinds. I was on the other side of the blinds, in the bar-room ; the first I saw of the defendant he came from behind the blinds with Barney Willis and some other man, whose name I do not know. As soon as defendant saw the deceased, he walked towards where deceased was, who was talking with George Carl, and said two or three times he could whip the deceased ; I did not hear Osborne make any reply. Then Jones drew what I think was a knife, and struck the deceased ; he drew it from some part of his clothes, as I did not see it in his hands before that time ; I call the knife a dirk knife ; after giving the stroke upon the shoulder, on the left side, Carl and Houston took hold of defendant ; when they did so, Osborne made a stroke at Jones ; can't say whether he struck him or not. Carl and Houston then put Jones out of the door ; there may have been some others that assisted them in doing so. A young man by the name of Criss, who staid with Kahr, then pushed the door to ; there was considerable noise outside for some two or three minutes ; Jones then came pushing to the door again ; the young man pushed the door against defendant ; after a little while Jones pushed the door

in; he had the knife in his hand; Osborne was standing by the counter; defendant cut him again about five inches from the navel, on the left hand side; defendant backed then, and Barney Willis and some one else took hold of him. Osborne walked out of the door in the store part of the house, and some one asked him to go up stairs to see if he was hurt; saw no more; saw Willis and the other man throw defendant on the floor and take the knife out of his hand. I was standing some three or four yards from the parties when it occurred; could not see all things in the house, but saw all I testified to. Did not hear Osborne say any thing to Jones; he made the stroke at him which I testified to. Osborne was sober; saw Osborne afterwards up stairs on the bed; saw the wounds; he lived until three or four o'clock next morning. I sat up with him all that night; he died between three and four o'clock on the morning of the 26th. Saw the wound on the shoulder-blade; it did not look more than skin deep to me. The wound on the loin was a pretty large one, his intestines came out through it; don't know if they were cut; the doctor put them back.

*Cross.*—Mr. Jones looked to me as pretty tight; he did'nt look very drunk; he seemed to be able to go where he desired; he staggered about considerably; was not much acquainted with him to know if he was devoid of sense or not, and could not say when he was very drunk. Could not swear he had a knife until he (Jones) came back the second time; I saw what I thought was a knife the first time; am sure I saw it the second time. If Osborne said any thing to defendant, I did not hear him.

Osborne was standing at the counter when defendant approached him; am certain that defendant struck the first blow. Defendant was out about two or three minutes after he was put out. Did not see any effort made to get Osborne out; did not hear Osborne say he would stay there. They got Jones down before they got his knife away; did not see him try to cut his friends; two persons had hold of him;

he tried his best to keep the knife. Did not see Osborne take hold of Jones when he returned; he did not have hold of Jones when defendant cut him. Osborne and myself worked together, and had been acquainted a good while; went with the deceased there that morning. Osborne took two drinks that day; we were there about five minutes; could not tell what the fuss behind the screen was about. James Rooney sat up with the deceased a part of the night, and Andy Benny also sat up with him that night.

*Direct.*—George Houston went away from here; don't know when. Barney Willis, saw him on the day of the Mayor's election; have not seen him since. Last I heard of Houston he was in Macon.

*Diderick Kahr*, sworn: Heard the evidence of Owen Gilfoyle; it was my brother's bar-room. I stayed there at that time, and saw the difficulty; it was on the 25th December last, about ten o'clock in the morning. I walked to my brother's bar-room, which was opposite the Waynesboro' ticket office; when I got there I saw some friends there, Myers and Jacob Sanchas, and some others. I stayed a little while. I saw Tom Jones, Barney Willis, William Day and some others come towards the bar-room; saw Tom Jones was very drunk; they came in and there was loud talking. Saw Sanchas and Mr. Coker standing before the bar at that time; Sanchas asked Tom Jones to take a drink with him; Jones declined. Barney Willis came in and said defendant should not drink any more, that he had enough, that if he got any more he would throw it out again. Jones, Willis and the others walked towards the store and sat down. Jones was talking loudly: did not notice what he said. I then saw Owen Gilfoyle and William Osborne come over; I met them in the front store, and when they came in I told them "Christmas gift." They went to the bar-room to get a drink or segar, I don't know which. I walked around, saw Jones and the others go to the door which leads to the store; saw Jones stop at once and say, as I supposed to Osborne, "I

can whip you." He then took out his knife; it appeared to me to be a dirk; drew it out with the case, went towards Osborne and made a lick at him with it; the case was on it at the time. It seemed to me that Osborne defended that lick; don't think that it hurt him at that time; saw, that George Carl was between them; saw Osborne strike at Jones on the left side; am not certain whether he struck him; it seemed to me he struck him on the left side. Saw Carl push Jones back through the bar-room door into the store. I went towards Osborne and told him, Bill, go out of the side door leading into the entry, keep out of the fuss, don't have no fuss here. He gave me to understand he was not going out; he said, I think, that he did not want to have a fuss there. I turned round to the door which leads to the front store to shut the door; at the same time Jones had come back; I caught Jones between the door as I was shutting it. I let go the door and went round the counter; Jones went right up to Osborne. When I was around the counter I saw Osborne have hold of Jones pushing him back; he had one hand on the throat and the other on the arm of defendant. I saw Tom Jones stab at Osborne at the same time, with what appeared the same dirk; saw him stab Osborne on the side, the place described by Mr. Gilfoyle. I then saw Willis and another person whom I did not know, take the knife away from defendant after parting them. Jones told me after they took the knife away from him, that he was a friend to Jake Clarkson, and that he had imposed on him, meaning, as I supposed, Osborne. I then saw Willis and the others take Tom Jones off. Saw Osborne's clothes cut, and blood coming through it; the cut was on the side. It seemed to me that Jones knew Osborne. A very short time had elapsed between the time that Jones was taken out and returned. Osborne was pushing defendant back when I saw them from behind the counter; I suppose it was to defend himself. Willis took Jones's knife away; they had to scuffle to take it

away; they seemed to have him on the floor to take the knife away.

*Cross.*—I tried to persuade Osborne to go out; he gave me to understand that he was not going out, but he said something else; but I was in such a hurry that I did not understand what he said. Jones' friends were trying to get him away; Jones was very drunk; he staggered about. Am acquainted with Jones; he seems when he is drunk to be out of his mind. I saw Tom Jones have a knife in his hand; was afraid he would cut me, I therefore left the door, knowing that he would do so when drunk. Did not notice whether his friends were cautious or not when they disarmed him. Barney Willis did say he was foolish, and he should drink no more; this was before Osborne came; the loud talking behind the blinds was the effort of Jones's friends to take him off; it was then they met Osborne and Gilfoyle. When I saw them from behind the counter, Osborne had advanced a short distance from the place where I saw him as I went behind the counter; he was pushing him when the lick was given. Osborne was the largest man, and weighed about 180 or 200 pounds, defendant about 125 pounds; think that lick was given to deceased in the loin, whilst he was pushing defendant some four or five feet; he had defendant by the throat and right arm. Defendant when sober, was upright and gentlemanly in his conduct. (When intoxicated on that occasion, were his acts such as if he knew what he was about? Objected to. Objection sustained.) Heard Jones talk; he talked loud; he said a heap of things which I did not notice. The impression made upon my mind from what he said was that he was too drunk to know what he was doing.

*Direct.*—When Jones came back, Osborne was standing ing in the bar-room, somewhere in front of the counter; he went right towards Osborne, and I went behind the counter. Osborne and deceased moved from the counter towards a little table; Osborne was pushing defendant back. Saw

Jones go up to Osborne; don't think Osborne walked up to meet defendant. Jones, when he came in the door, advanced to Osborne with his dirk.

*Cross.*—When I turned, after I passed around the counter, I saw defendant and deceased together. Osborne had pushed defendant back about three feet from where he stood when I went around the counter, and he pushed him some four or five feet afterwards; defendant was cutting at the deceased at the same time.

*Robert H. Corker,* sworn: On the morning of last Christmas, as I was sitting by the stove in that bar-room, Jones and others came in while I was sitting there; they came around and took a seat by the stove, and I got up; just as I was going out, Osborne came in; Osborne asked me to take a drink with him; I declined, and walked on to the front part of the store, near the door; I remained between three to five minutes, my attention was attracted to a noise in the bar, I turned and saw them putting Mr. Jones out of the bar. Saw Osborne standing at the bar about the same place where I had left him. The parties tried to close the doors upon Mr. Jones; Jones had a knife in his hand, a long, slim knife, it had the appearance of a dirk. They did not succeed in fastening the door, and he rushed back. I then stepped towards the bar-room door, and Osborne walked out into the front room. I stepped to the door and saw Willis and others have Jones upon the floor trying to take his knife away. I stepped to Osborne and told him he had best to leave; he said he could not leave, that he was cut; he pulled up his vest and showed me where the blood was coming through his clothes at his side. Saw Jones scuffling with knife in hand to come back; he made a remark to Mr. Kell, that he would cut him or any body else who would prevent him from coming back.

*Cross.*—Did not see them take the knife away; saw Barney Willis and others make the effort to take it away. There were two or three persons there I did not know; think

I saw Kell and defendant together several times; don't know as to the extent of their friendship; Kell was there taking care of defendant, and seemed to be acting as his friend that day.

The following evidence admitted by defendant's counsel:

The description of the wounds.

The death of William Osborne.

The wounds which caused his death were those described in the indictment, and that the death occurred at the time stated in the indictment.

State closed.

The defendant offered no evidence, and his counsel requested the presiding Judge to charge the jury:

1st. That mental alienation or unconsciousness from any cause whatever, at the time the deed was done, to the extent that the accused did not know what he was doing, will rebut any presumption of malice arising merely from the apparent recklessness of his conduct, so as to reduce the offence from murder to manslaughter; the Court stating that he gave the instructions as asked, except as to the *furor brevis* of drunkenness or fit of drunkenness; the Court further adding, in substance, that if a party be deprived of reason by the act of God, such as occurs in the case of lunacy or idiocy, or permanent insanity, then he is not responsible; but this exemption does not apply when he voluntarily, and of his own accord, induces temporary mental alienation by intoxicating drink. Which charge, so requested, the Court failed and refused to give, to which failure and refusal, and to which addition and exception to the language of said charge, counsel for prisoner excepted.

2d. That the existence of malice is not presumable in this case, if on any rational theory consistent with all the evidence, the killing was either justifiable, excusable, or an act of manslaughter.

The Court refused to give the charge as requested, adding, "the question of malice is left distinctly to the jury."

To which failure and refusal to charge in the language as requested, counsel for prisoner excepted.

3d. That the jury must find from the evidence that at the time of the killing, Jones was a person of sound memory and discretion, otherwise the defendant cannot be convicted of murder.

The Court stating that the instruction was given as asked, except the unsoundness or want of discretion arose from a *furor brevis*, or fit of drunkenness, as before stated.

To which failure and refusal to charge, as requested, counsel for prisoner excepted.

To each and all of which failures and refusals to charge as requested, and charges as given, counsel for prisoner excepted, and now excepts and assigns the same as error.

A verdict of guilty was rendered; whereupon, counsel for prisoner moved the Court for a new trial, on the following grounds:

1st. Because the Court erred in refusing to charge the jury, in the words following, as asked by prisoner's counsel, to-wit: "That mental alienation or unconsciousness from any cause whatever, at the time the deed was done, to the extent that the accused did not know what he was doing, will rebut any presumption of malice arising merely from the apparent recklessness of his conduct, so as to reduce the offence from murder to manslaughter. The Court stating that he gave the instructions as asked, except as to the *furor brevis* of drunkenness, or a fit of drunkenness. The Court further adding, in substance, that if a party be deprived of reason by the act of God, such as occurs in the case of lunacy or idiocy, or permanent insanity, then he is not responsible; but this exemption does not apply where he voluntarily and of his own accord induces temporary mental alienation by intoxicating drink."

2d. Because the Court erred in his ruling, and in refusing to

Jones vs. The State.

charge the following words asked by defendant's counsel, to be given in charge to the jury: " The existence of malice is not presumable in this case, if on any rational theory, consistent with all the evidence, the killing was either justifiable, excusable, or an act of manslaughter." The Court refusing to give such charge, adding, "the question of malice is left distinctly to the jury."

3d. Because the Court erred in his ruling and charging upon the following instructions asked for by defendant's counsel, to-wit: That " the jury must find from the evidence that at the time of the killing, Jones was a person of sound memory and discretion, otherwise the defendant cannot be convicted of murder;" the Court stating that the instruction was given as asked, except the unsoundness or want of discretion arose from a *furor brevis,* or fit of drunkenness, as before stated.

4th. Because one of the jurors who sat upon the trial of the cause, and who rendered the verdict of guilty as above stated, to-wit, Charles W. Gruber, was not an impartial and unbiased juror, between the State and the defendant, for that said juror had before said trial, expressed very decided opinions against the defendant; that he knew him, and that defendant ought to be hung; which was wholly unknown to the defendant or his counsel at the time he was put upon the prisoner by the State, and until after said verdict was rendered. In support of which last mentioned ground for new trial the annexed affidavits were submitted, marked exhibits A, B, C, &c. The said juror, Charles W. Gruber, having been previously asked the questions prescribed by the statutes, had by his answers thereto rendered himself a competent juror.

The presiding Judge refused to grant a new trial. Whereupon, defendant excepted, and assigned said refusal as error.

ALEX. H. STEPHENS; and E. J. WALKER, for plaintiff in error.

Sol. Gen. ROGERS; and WILLIAM R. McLAWS, *contra.*

*By the Court.*—STEPHENS J. delivering the opinion.

[1.] This was an indictment for murder. The killing was admitted upon the trial, and the defence turned wholly upon the grading of the homicide. The Judge was asked by the defence to charge the jury, " that the existence of malice is not presumable in this case, if on any rational theory consistent with all the evidence, the killing was either justifiable or excusable, or an act of manslaughter." The equivalent of this proposition, in simple terms, is that the jury should not grade the killing as murder, if the evidence would justify them in grading it either as justifiable homicide or as manslaughter.

The charge thus stated becomes a truism in criminal law, and we think was improperly refused. The Judge says, that the grade of justifiable homicide was not presented as an issue by the argument. If this remark be an intimation that the issue was not properly presented, it is sufficient to reply, that it was as competent to present it by asking a charge, as by making a speech, and the very request under consideration does present the issue. The Judge refused to let that issue go to the jury, because in his opinion there was no evidence which could support it. His opinion that the evidence could not support the supposition of manslaughter, if he had happened to have that opinion, would have been equally potent to exclude *that* grade also from the consideration of the jury. His opinion, then, if such had been his opinion, that there was no evidence which could possibly justify or mitigate the killing, would have been sufficient foundation for a judgment of murder by the Court, without the intervention of a jury. The homicide being admitted, there were but three possible conclusions in the case: murder, manslaughter, or justifiable homicide; and the exclusion of any two of the three, would necessarily have been an

adoption of the third.   The Judge held, that his opinion was competent to exclude one of the three conclusions of law; if so, his opinion, if he had happened to have that opinion, would have been equally competent to exclude two; and the exclusion of two, would have been the adoption of the third, and a settlement of the whole business by himself.

He had no use for a jury on the issue of justifiable homicide, because, in his opinion, there was no evidence which showed a justification; and if he had happened to be further of the opinion, that there was no evidence which showed a mitigation, he could not have had any use for a jury on the issue of manslaughter.

The remaining conclusion of murder, would have been as certain as that one remains after taking two from three; and he could have had no more use for a jury in arriving at it, than he would have had for a jury to assist him in deciding a motion for a nonsuit.   Would *this* be allowing the jury to judge of the *law* and the fact?   It would be to obliterate the line of demarkation between the province of the Judge and the province of the jury in criminal cases, and to unite them both in the person of the Judge.   To judge of the law and the fact, in a criminal case, is to determine from the evidence what acts were done, and with what intentions, and then to decide what crime they constitute, or whether they constitute any crime at all.   In this case the Judge allowed the jury to decide *what* crime, but refused to allow them to consider whether there might be *no* crime.   They were entitled to decide *all* the law of the case, but they were precluded from deciding a very important part of it.   In the case of *Holden vs. The State*, 5 *Ga. Rep. p.* 445, this Court, consisting at that time of its first three Judges, said: "In short, the Court in the full exercise of its own functions, must still obey the behest of the statute, and concede to the jury the exercise of *their* judgment on *all the law of the case.*"

In an accusation of murder, where, as in this case, the defence turns upon the grading of the homicide, in order that

the jury may exercise their judgment on all the law, of the case, all of the grades put in issue, either by the argument or the requested charges, ought to be submitted to their decision, along with proper instructions as to what constitutes each grade.

The Judge instructs, but the jury decides. Every person accused of crime is entitled to have the decision of a jury, upon any defence of law which he may choose to rest upon the facts in evidence. Courts may distrust juries, but the Legislature confided in them.

[2.] In grading this homicide, what instructions ought to have been given to the jury concerning the drunkenness of the accused? This Court, approving of the Judge's refusal to give the instructions asked by the defence, thinks that other important instructions not given, would have been appropriate to the facts in evidence. I shall point out what we think would have been the proper instructions, but shall first present those views of the general subject which lead my own mind to the conclusions at which the Court arrived.

One side in the argument affirms as a great principle, that no man, drunk or sober, should be punished for a crime which he did not have sufficient mind to perpetrate; and the other replies, with an equally important principle, that drunkenness is no excuse for crime. The two sides, each relying upon its chosen principle, have arrived at singularly conflicting conclusions. The truth is, that both these principles are correct, and constitute with the just deductions from them, but parts of an harmonious whole, sustained by law and sanctioned by reason.

The error which the side of the accused commits, lies in assuming too large a quantum of mind as the *minimum* which can furnish the necessary mental element in all crime —in erecting too high a standard of mental capacity. Different classes of crimes do involve different degrees of mind, and in all classes there may arise particular instances which, in the mode and circumstances of their perpetration, may in-

... Jones vs. The State.

volve even a high degree of scientific knowledge. But subject to this qualification of the general truth, the general truth itself is, that the minimum of mind which can furnish the necessary mental element in crime, is a far smaller quantity than was claimed by the argument for the accused. The argument, rightfully assuming that there can be no murder without the mental element of malice, proceeded to claim, as being necessarily involved in malice, an amount of memory and reason which I think is not justified by the legal dimensions of that malice which enters into the constitution of murder. The popular idea of malice in its sense of revenge, hatred and ill will, has nothing to do with the subject. A number of cases might be given to show the difference between the popular idea, and that malice which forms a necessary part of the legal crime of murder

The crime of infanticide presents the difference in a striking light. This crime is clear murder, and the mother who destroys her infant to conceal her own shame, has legal malice, though in point of fact she may feel no hatred towards any human being in the world, nor any indifference to human life in general, and may actually have the yearnings of a mother's love towards her innocent victim,—loving its life just less than her own reputation. Here there is no malice, in the popular sense assumed in this argument, and yet the law says there is malice, and that the killing is murder; and reason gives its undoubting sanction to the law. The legal idea of malice in the crime of murder is, simply, an intent to kill a human being, in a case where the law would neither justify nor in any degree excuse the intention, if the killing should take place as intended. I make no distinction between malice express and malice implied in this definition, for there is no difference except in the mode of arriving at the fact. You may prove the particular intent, or you may prove the more general intent, which includes it and implies it, but the thing when once you get it, is the same in both cases, and is the simple intent to kill a human being,

in such a case as I have stated. Whether this intent springs from hatred or from a sense of shame, or from the mere phrensy of drunkenness, it is malice, it is the mental constituent of murder, unless there is something to justify the intent, or in some degree to excuse it. Now, the kind of a case in which this intent happens to be formed, obviously has nothing to do with the *quantum of mind* involved in its formation. Whoever then has mind enough to form the simple intention to kill a human being, has mind enough to have malice, and to furnish the mental constituents of murder. And even this quantum of mind, small as it is, is to be viewed and investigated in the light of an important rule of evidence applicable to all men alike, and founded on reason and necessity. It is, that all men are presumed to intend the natural and *proximate* consequences of their actions. When a man kills another by the use of means appropriate to that end, he is presumed, drunk or sober, to have *intended* that end.

This is but a presumption, but it must prevail until it is rebutted by other facts and circumstances, showing that the end was not intended, but was accidental; it cannot be rebutted by the mere vague opinions of witnesses that the man had " no mind," or " did n't seem to know what he was doing." The result is, then, that any man, sober or drunk, sane or insane, has *mind* enough to furnish the mental element in murder, when he has enough to form the intention to kill a human being; and he shall be presumed to have formed that intention, whenever he has done the act of killing by the use of appropriate means, unless there are circumstances to show that death was an accidental and not an intended consequence of his act. This doctrine faithfully enforced, offers no escape to the drunken man, from punishment for the crimes which he *commits*, and for those not committed by him, he ought not to be punished. Under this doctrine, if it were the whole law applicable to his case, even the poor idiot could

" scarcely be saved." But it is not the whole law applicable to his case.

And this brings me to a consideration of the great perversions which have been made of the doctrine that drunkenness is no excuse for crime. The foundation stone of these perversions, not distinctly shaped in the argument, but unconsciously assumed in it, is a feeling or notion that the exemption of insane persons and young children from criminal responsibility, is not the result of positive law excusing them, but is the simple consequence of their mental deficiency, which is supposed to be so complete as not to be capable of furnishing the mental element of crime; while the drunken man, with the same actual mental deficiency, is held responsible for his actions, not because they are crimes having the mental and physical element of crime, but by virtue of a certain *destructive* capacity infused into him, from reasons of policy, by the law which declares that drunkenness shall be no excuse for crime. The reverse of all this is the true philosophy of the law. The law deals with all of these classes of people, as having a sufficient quantum of mind to have bad passions, and evil intentions, and carelessness in their actions, and so to furnish the mental element of crime, but as laboring also under an infirmity of reason, which serves to betray them into these evil intentions and carelessness, and at the same time breaks down this power of resisting temptation. The law comes in then, and excuses the young and the insane, out of tenderness towards an infirmity which is involuntary, and at the same time, to guard against the possibility that men might make the same excuse whenever there is the same infirmity of reason, the law takes special care to exclude drunken men from the excuse, because their infirmity is voluntary.

The result is, that the young and the involuntary insane occupy a platform of their own, by virtue of an exception made in their favor, while the voluntary insanity of drunk-

Jones vs. The State.

enness being excluded from the exception, stands just as if no exception had been made, and the drunk man and sober man occupy the same great platform of responsibility for the crimes which they commit, and for no others.   When their actions have the criminal mental element united with them, they become crimes—*but not till then.*

The crimes of drunk men, like those of sober men, are *actual* crimes, not constructive ones—*whole* crimes, not pieces of crimes.   And drunkenness, like all other things which are not made excuses by positive law, is no excuse for crime, but is like all the rest, a *fact* which ought to be used whenever it can, as it often may do, to shed light upon either branch of the alleged crime, the physical or mental, in investigating what crime, or whether any crime has been committed.   The argument might safely be left where it now stands, but I prefer to trace the fallacies which have been founded on a sound principle, through the two special forms in which they have presented themselves.   One is this: Drunkenness is no excuse for crime, *therefore*, drunkenness can not be used for any purpose of defence in a criminal accusation.   A *non sequitur*, if ever there was one.   Ignorance of chemistry is no more an excuse for crime than drunkenness is; *therefore*, if the reasoning be good, ignorance of chemistry cannot be used for any purpose of defence in a criminal accusation.   If Dr. Webster, on his celebrated trial at Boston, some years ago, for the murder of Dr. Parkman, could have shown that he was ignorant of chemistry, he could have shown conclusively, not that he had an excuse for the murder, but that he did not commit it; for the slayer, whoever he was, had carried the dead body through a process of destruction, involving high chemical knowledge. No doubt the Court would have allowed him to save his life by proving his ignorance of chemistry, although ignorance of chemistry was no excuse for crime.   Suppose now, the Doctor could have proved that he had been drunk to the

point of stupor or *mania potu*, during the time when that chemical process must have been performed.   No doubt the Court would have allowed him to do so, not to excuse, mitigate, or extenuate his crime, but simply to show, in a very satisfactory way, that he had not committed the crime; for it is exceedingly improbable that a man in that degree of drunkenness, could have conducted the chemical process.   And Dr. Webster would have been allowed to save his life by proving that he was drunk.

Some years ago, I knew an attempt at house-burning, where the slow match, found after the fire had been extinguished, exhibited great ingenuity in the bending of wires and crooking of pins in a peculiar way, so as to secure both slowness and certainty of ignition.   The crooking of the pins especially, in a manner so peculiarly adapted to the end in view, was the theme of village wonder, for weeks afterwards, and is still remembered by many persons as a remarkable display of mechanical genius.   Now there were two or three men who frequented that village in those days, any one of whom, if suspicion had fallen on him, could have proven, that at any time for a week before the fire, he had been too drunk to crook a pin.   Would any man have discarded that evidence, if he had been seeking for the *truth?*   Both these illustrations show the absurdity of excluding the consideration of drunkenness, in investigating the *act*, which enters into the alleged crime; but another form of the fallacy is, that when the act appears to have been done by the accused, he shall not be allowed to excuse his act by any consideration of his drunkenness.   It might be sufficient to reply to this, by saying, the law says, that for *crimes*, not acts, drunkenness shall be no excuse.   This form of the fallacy ignores utterly the most important element of the crime; for the mental part of the crime is criminal in morals and religion, without its union with any act whatever, while neither in law nor morals, has the act any criminality whatever, until connected with a criminal state of mind.   *Acts* need no ex-

cuse; *crimes* do. This form of the fallacy puts a drunk man, not on the same platform with sober men, but on a much more disadvantageous one. The act when done by appropriate means, carries a presumption against all men, sober or drunk, that it was intended to be done; but this proposition is to leave it but a presumption against sober men, and to fix it irrevocably as a conclusion against a drunk man. The proposition admits, that drunkenness, like any other, "no excuse" for crime, may be used to throw light on the investigation into the physical constituent of the crime, but denies that it may be used in examining into the *mind*, which is the special field where drunkenness displays its power. That is to say, it may be used in that part of the investigation, on which it ordinarily throws least light, but must be excluded from that branch on which it usually throws most light. Can there be a sensible reason for such a discrimination between the purposes for which drunkenness may be used? It is too apparent to need argument, that when the act is shown, the mental constituent of the crime still remains to be investigated, and in this investigation, there can be no rational discrimination made between the light which may be shed upon it by drunkenness, and that which may be shed by any other fact in the world. Let me illustrate this branch of the investigation. The fact of being a skillful physician is no more an excuse for crime than drukenness is, and *therefore*, if the reasoning in the last form of the fallacy be good, the fact of being a skillful physician, ought not to be used for the purpose of showing with what intention an act was done. A man indicts another for an attempt to poison him, and proves that the accused actually administered arsenic to him. Here the act is done, and the sole question is as to the *intent* with which it was done. The accused simply shows that he was a skillful physician, and this single fact, in connection with the other fact, that the man did not die, but got well, explains the whole case, and shows that the act was done with an innocent and praise-

worthy intention; for if a skillful physician should intend to kill by arsenic, he would infallibly regulate the dose to kill, and not to cure. And here the man is permitted to " excuse" his act in the language of the fallacy, by proving his own superior knowledge, a fact which of all others, is surely the *last* which ought to be allowed to excuse any crime. Is it not plain, that he does not use the fact, to " excuse his act," but simply to show that the act was an innocent one which needed no excuse? Shall not drunkenness be used for the same purpose when it can shed the same light?

A skillful marksman shoots at a bird, at a short distance, but misses the bird and kills a man, who was behind the bush, and who turns out to be one with whom the marksman had a deadly feud. He is indicted for murder. The fact, that a man so skillful with his gun should have missed the bird at so short a distance, and should have hit his enemy, makes a strong impression, that the shooting at the bird, was but a pretence to cover the real intention to slay his enemy. But the man shows that he was *very drunk*, a fact which renders it at once very probable that he should have missed the bird, and very improbable that he had sufficient capacity for so deep an artifice, as the one imputed to him, for drunk men are much more apt to be the victims, than the perpetrators of tricks. Is there in the world, an enlightened christian, or a barbarian, who will say that this man ought not to be allowed to save his life by proving that he was drunk? The fact has no effect to excuse his crime, nor to excuse his act, but to show that his act, though an unfortunate one, was innocent and needed no excuse; or else, to show that it was not an act of *murder*, but an act of involuntary manslaughter, in the pursuit of a lawful intent without due caution and circumspection. On the question of murder, his drunkenness is in his favor, but on the question of carelessness, in the pursuit of his lawful intent, it is against him; for carelessness is much more easily believed of a drunken man than of a sober man. His drunkenness saves

him from the one charge, and convicts him perhaps of the other, not by excusing the one crime, nor aggravating the other, but simply by shedding the light of *truth* upon both. Apply these principles to the case before us. Osborne with one hand seizes Jones by the arm, and with the other by the throat, and pushes him back. Jones stabs Osborne and kills him. Jones is indicted for murder. His defence is that the killing was but the repelling of an assault and battery, which reduces it to manslaughter at all events, and will also reduce it to justifiable homicide, if the jury should think he had reasonable fear, that Osborne would choke him to death. The State replies, that though such an assault and battery occurred, the killing was not produced by it, and was but the execution of an intent formed and in process of execution, *before* the assault and battery occurred. Right here, hangs the case, the defence maintaining that the intent to kill was produced by the provocation, and the State maintaining that it existed before. What is the evidence to support the view of the State ? Jones was walking up to Osborne with a knife in his hand, and he was very drunk. Here his drunkenness is against him, for it is easier to believe that a reckless drunk man intends to kill without provocation, than that a thoughtful sober man has such an intention. This is the whole case made by the circumstances of the fatal rencontre, to show that Jones had an intent to kill *before* he received the provocation. But the State wisely chose, not to rest the case there, and the strongest evidence on the point, is light reflected from a *previous* rencontre, in which Jones had much more clearly manifested the intent to kill. The argument was, that having had the intention in the first rencontre, he must be presumed to have *persisted* and *continued* in the same state of mind, up to the second rencontre, a very short time afterwards. The interval between the two rencontres, is not definitely stated, but it was sufficiently long for Jones to be put out of the house and come back again, and be the interval long or short, the whole

force of the argument lies in his presumed persistence and continuance in the *same state of mind*, from the first rencontre to the second. And right there his deep drunkenness was evidence in his favor, tending to rebut the presumption of such a persistence or continuance in the same state of mind. Who needs to be told that drunkenness may almost destroy memory for the time, making it as a mere *seive*, letting events and thoughts, and intentions slip through it as soon as they fall into it? He might have *forgotten* the first rencontre, and all its passions and intentions, and so have brought none of them to the second—if he was *very* drunk. But drunkenness, far short of the point of extreme forgetfulness, renders the mind inconstant in purpose, and exceedingly whimsical and rapid in its changes from one emotion to another, and even from one class of emotions to another class.

Who has not seen the drunken man, breathing threats one moment, and the next, uttering maudlin professions of friendship—in one moment an imaginary hero, in the next, an abject whimperer?

The whole tendency of drunkenness, was to *change* that state of mind—which the State maintained had *not* been changed, but had *continued* from the first rencontre to the second. Its tendency was to rebut the strongest evidence, which showed the formation of an intent to kill, before the provocation was given. And it is exactly for this purpose, that the drunkenness, in the opinion of this Court, ought to have been considered by the jury, to assist them in deciding, whether the intent to kill preceded the provocation, or was produced by it.

Judgment reversed.

Lyon J. dissenting.