## 45609. FOSTER v. THE STATE.
### (374 SE2d 188)

MARSHALL, Chief Justice.

This is a death-penalty case. Queen Madge White, a 79-year-old widow, lived by herself in Rome, Georgia. Early in the evening of August 27, 1986, a friend took White to choir practice, and brought her home at 8:30 p.m. White talked to her sister by telephone at 9:00 p.m. and everything was normal. However, when the sister stopped by early the next morning, she discovered that White's house had been broken into and ransacked. The sister called the police, who found White's body lying on the floor in her bedroom covered to her chin by a blanket. Her face was coated with talcum powder. Her jaw was broken. She had a severe gash on the top of her head. She had been sexually molested with a salad-dressing bottle, and strangled to death. A number of her possessions were missing from her home.

The appellant, Timothy Tyrone Foster, was arrested for White's murder a month later when he threatened his live-in companion and she responded by turning him in. The victim's possessions were recovered from their home and from Foster's two sisters. Foster was interrogated and confessed. A jury convicted him of malice murder and burglary, and sentenced him to death. This is his appeal.[1]

1. Foster first contends the trial court erred by excusing one prospective juror and by failing to excuse eight prospective jurors.

Prospective juror Black was excused because of her views against capital punishment. The test for excusal is "whether the juror's views [on capital punishment] would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U. S. 412, 424 (105 SC 844, 83 LE2d 841) (1985). See Alderman v. State, 254 Ga. 206 (4) (327 SE2d 168) (1985).

Black's answers to questions about the death penalty, like those of many other prospective jurors, were somewhat contradictory. See Curry v. State, 255 Ga. 215, 220 (336 SE2d 762) (1985). As she

---

[1] The crime occurred August 27, 1986. Foster was arrested September 26 and indicted on October 17, 1986. The case was tried April 20 through May 1, 1987. A motion for new trial was filed May 28, 1987 and heard November 24, 1987. The trial court denied the motion on February 3, 1988. A notice of appeal was filed March 3, 1988, and the case was docketed in this court on March 21, 1988. Oral arguments were heard June 6, 1988.

pointed out, she had never before been asked to express her views on capital punishment. See *Spivey v. State*, 253 Ga. 187, 197 (fn. 3) (319 SE2d 420) (1984). She did state, however, that, although she "maybe" could change her mind, she was opposed to the death penalty, and she stated repeatedly that she would automatically vote for a life sentence in a murder case. The trial court's finding that she was disqualified is not clearly erroneous. *Wainwright v. Witt*, supra at 431.[2]

Foster contends that prospective juror Tate should have been excused because he initially stated that he would vote automatically to impose a death sentence if the defendant were convicted, and because he had formed an opinion that the police had "probably got the right man" when they arrested Foster. However, it is clear that Tate was confused at first by the question about the automatic imposition of the death penalty.[3] Further questioning cleared up the confusion and showed no disqualification in this respect. Compare *Pope v. State*, 256 Ga. 195 (7 f) (345 SE2d 831) (1986). The previously-formed opinion as to guilt was not so "fixed and definite" as to necessitate an excusal for cause. *Childs v. State*, 257 Ga. 243 (8) (357 SE2d 48) (1987). Tate stated repeatedly that he could set aside his opinion, and decide the case strictly on the evidence. *Spivey v. State*, supra at 196-7.

Foster also contends that prospective juror Holder should have been excused for his views on the death penalty. Any death-qualification issue here is moot, since this prospective juror was excused on other grounds.

Foster complains of the refusal to excuse six additional prospective jurors on the ground of bias. Some of these prospective jurors knew the victim, but none was close to her, and they all testified that they could be fair and impartial jurors and could decide the case on the evidence presented. The trial court did not err by overruling Foster's challenges for favor. *Wilson v. State*, 250 Ga. 630 (4 b) (300 SE2d 640) (1983).

2. The voir dire examination concluded on a Friday afternoon. The jury was selected Monday morning, giving the parties the weekend to plan their peremptory challenges. The qualified panel from which the jury was selected included four blacks. The district attorney exercised peremptory challenges against each of the four black

---

[2] We note that Black gave inconsistent answers to several attempts to ask a question in the exact language of the *Witt* test for excusal. Although the standard enunciated in *Witt* is the test for excusal, it is not necessarily the best or most comprehensible voir dire question. As is noted in *Witt*: "Relevant *voir dire* questions addressed to this issue [of death-qualification] need not be framed exclusively in the language of the controlling appellate opinion; the opinion is, after all, an opinion and not an intricate devise in a will." Id. at 433-34.

[3] Tate was not alone. Many of the prospective jurors stated at first that they would vote automatically for *both* a death sentence *and* a life sentence.

jurors. Foster timely raised an issue of racial discrimination in the prosecution's exercise of peremptory challenges. See *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986). The trial court ruled that a prima facie case had been established, and required the prosecutor to explain his exercise of peremptory challenges. See *Gamble v. State*, 257 Ga. 325 (2) (357 SE2d 792) (1987). Foster contends the trial court erred by finding that the state successfully rebutted the prima facie case. As we stated in *Gamble* (quoting from *Batson*):

> The [prosecutor's] explanation [of his peremptory challenges] "need not rise to the level justifying exercise of a challenge for cause," but it must be "neutral," "related to the case to be tried," and a " 'clear and reasonably specific,' explanation of his 'legitimate reasons' for exercising the challenges." [Cit.]

*Gamble*, supra at 327.

The defense in this case centered around Foster's deprived background and his use of drugs and alcohol. Many of the defendant's witnesses were social workers. Part of his defense was that when he was a juvenile he had not been committed to a Youth Development Center for the commission of armed robbery, notwithstanding the contemporaneous recommendation of a psychiatrist that only incarceration and strict discipline could possibly have any "lasting impact" on his anti-social behavior. Instead, he was returned by the state to an unsuitable and harmful family environment which included heavy drug use by his own parents and a girl friend who "sold [her] body" for cocaine. Foster contended he was mentally ill and, further, that he was involuntarily intoxicated by alcohol, marijuana and cocaine.

The prosecutor was familiar with Foster's background and knew that Foster intended to assert a defense involving mental illness and drug usage. He explained his challenges of the four black prospective jurors as follows, taking them in the order in which they underwent voir dire:

The first juror has a son the same age as the defendant who has been convicted of a misdemeanor theft offense. His wife works at the Northwest Georgia Regional Hospital, a mental health facility. His brother was once a drug consultant. During the *Witherspoon* questioning, the juror appeared to be reluctant to say that he could vote for a death sentence, and he is a member of a church whose members, in the experience of the prosecutor, tend to be very reluctant to impose the death penalty.

The defendant concedes the prosecutor was justified in striking the second juror, who, among other things, had talked to the defendant's mother before entering the courtroom.

The third juror claimed to be the half-sister of the district attorney's chief investigator (who is black). The investigator, however, denied being related in any way to this juror. Moreover, the juror denied having a friend or relative accused or convicted of a crime of violence and denied knowing anyone with a drug or alcohol problem notwithstanding that her brother is a repeat offender whose crimes involve theft by taking, burglary and drugs, and that her husband has been convicted for carrying a concealed weapon.

The fourth juror is a social worker involved with low-income, underprivileged children. Her first cousin was arrested by the Metro Drug Task force on serious drug charges and the cousin lost her job as a consequence.

The prosecutor explained that he did not want social workers on the jury in a death penalty case, as they tended to sympathize with criminal defendants, especially at the penalty phase. Moreover he preferred not to allow on the jury anyone who was closely related to someone with a drug or alcohol problem, since the defendant in this case planned to blame the crime on his own drug and alcohol problem. He further stated that he could not trust someone who gave materially untruthful answers on voir dire, as did the third juror. Finally, he was prepared to challenge peremptorily any juror who was reluctant to impose the death penalty as a matter of conscience where the juror's opposition to the death penalty did not rise to the level justifying a disqualification for cause.

The prosecutor's explanations were related to the case to be tried, and were clear and reasonably specific. The trial court did not err by finding them to be sufficiently neutral and legitimate. The court's determination that the prosecutor successfully rebutted the prima facie case is entitled to "great deference," *Batson* supra, 106 SC at 1724 (fn.21) and is not clearly erroneous in this case.

3. There was no abuse of discretion in the court's conduct of the week-long voir dire examination of prospective jurors. *Childs v. State*, 257 Ga. 243 (6), supra.

4. The trial court did not err by denying Foster's post-trial motion to review *in camera* the state's jury-selection notes. An attorney's work product is generally non-discoverable. A defendant's right to exculpatory evidence under *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963), is not involved here, and non-exculpatory information in an attorney's work product does not become discoverable simply because the opposing attorneys might find it strategically useful.

5. There was no error in the trial court's denial of funds for expert assistance to examine fingerprints, shoe prints and blood spatters. *Roseboro v. State*, 258 Ga. 39 (3) (365 SE2d 115) (1988); *Crawford v. State*, 257 Ga. 681 (5) (362 SE2d 201) (1987).

6. The evidence presented by the defendant in support of his motion for change of venue does not show such an inundation of pretrial publicity as would give rise to a presumption of prejudice. Compare *Coleman v. Kemp*, 778 F2d 1487 (11th Cir. 1986). The voir dire examination and qualification of prospective jurors support the trial court's determination that a change of venue was unnecessary. *Lee v. State*, 258 Ga. 82 (9) (365 SE2d 99) (1988).

7. On the day the crime was discovered, an investigator equipped with a video camera filmed the crime scene. The resulting videotape depicts the exterior of the victim's home (including the window through which the defendant entered), the path which he apparently took from the house (dropping things along the way and leaving footprints), the interior of the victim's home (and the extent to which it had been ransacked), and, finally, the victim's body (before and after the removal of the blanket covering her).

The trial court overruled Foster's objection that the videotape was inflammatory and duplicative of the still photographs of the scene and of the body which the state also introduced in evidence.

The videotape clearly was relevant. There was no abuse of discretion in the court's ruling. *Hicks v. State*, 256 Ga. 715 (13) (352 SE2d 762) (1987); *Jones v. State*, 250 Ga. 498 (3) (299 SE2d 549) (1983).

8. Foster was interrogated by the police on the afternoon of the day he was arrested. Mike Reynolds, the lead investigator, testified it was "the first time I had ever talked with [Foster] . . . [and] I really didn't expect a confession, [so] I didn't turn any of the video equipment on." However, after being advised of his rights, Foster confessed. Reynolds "didn't want to stop him . . . to go turn everything on," so he let him confess, and this first confession was not recorded.

Reynolds showed Foster the crime scene photographs. Foster denied raping the victim, but admitted molesting her with a salad-dressing bottle. Foster stated that he took the air-conditioner out of one of the bedroom windows, set it on the ground, and entered the house. He found some suitcases and began filling them. He found two pocketbooks and searched them for valuables. The victim woke up and went to the bathroom, without turning on any lights. Then, Foster stated, she returned to her bedroom and, turning on the lamp by her bed, saw the defendant for the first time, in the living room. She came into the living room armed with a knife, and chased Foster around the living room chair. He got a piece of wood from beside the fireplace and hit her on the head. After being hit, she ran to the bedroom and fell to the floor. Foster denied strangling the victim, claiming that he had merely wrapped a sheet around her neck. He admitted dumping white powder on her, "because it cools the body off." He could not explain why he "stuck" the salad-dressing bottle "up her," but he covered her body with a blanket so he would not have to look at her.

He left by the back door, and hid what he had taken in a nearby empty house until he could return for it the next day.

After giving the above statement, Reynolds tried to persuade Foster to confess a second time with the video recording equipment turned on. Reynolds testified Foster "was a little hesitant about confessing a second time." He and detective Craft spent "eight or nine minutes . . . trying to talk him into confessing to us a second time." Foster expressed concern that he might not say exactly the same thing the second time. The officers assured him that they were not trying to "trap" or "trick" him, and that "it would be better just to put it on tape . . . and it will be correct." The interview continued:

Craft: Just tell us again on tape one more time. It ain't going to hurt nothing.

Foster: Why can't we just leave it at that?

Reynolds: If . . . you want to leave it at this and not put it on tape, that is fine with me. . . . Let's just leave it. What this means is that Wayne and I are going to have to sit up all night long and write about you.

Craft: Yeah. But if we put it on tape can't nobody change what the tape says, you know. Okay? This is — this is as much for your benefit as it is ours . . . so let's just go through it right quick one more time and get it over with . . . Okay?

Reynolds: Tim, I haven't lied to you through the whole night, and I haven't tried to trick you through the whole night, and I am not trying now. . . . [Y]ou [sat] in here and told two police officers everything about it. . . . I am not trying to push you or bluff you or anything. It will just make it a lot easier on all of us.

. . .

Craft: Tim, let's go ahead and get this thing over with tonight. You told us about it already one time. Okay? Hey, let's run back through it right quick and get it over with and be done with it. Okay? . . . Do you want to do that? It ain't going to hurt, not a thing.

. . .

Craft: [Y]ou told us about it one time already. It ain't going to hurt, you know. I mean I think you will agree that it ain't

going to hurt, you know, for us to run back through it again right quick. . . .

Thus encouraged, Foster was interviewed a second time on videotape. His second confession was identical in all material respects with the first.

(a) Foster contends first that his confessions were induced by a "hope of benefit," OCGA § 24-3-50, because he was informed that he would not be charged with rape. There is no merit to this contention. Foster was simply told that no rape would be charged, based on his statement that no rape occurred. No benefit was offered to induce a confession.

(b) Foster contends further that it was error to admit the second statement in evidence because it was elicited only after he was told repeatedly that it was not going to hurt "a thing," and that it would be "as much for your benefit as ours." We agree. An accused must be warned that anything he says can and will be used against him in court. *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966). Telling him that a confession is not going to hurt and, on the contrary, will benefit him as much as the police, is not consistent with the warnings required by *Miranda*.

Nevertheless, there is no reversible error. The videotaped confession was merely cumulative to the first, non-recorded confession, and that confession and the remaining evidence overwhelmingly establish Foster's guilt. Any error here is harmless beyond a reasonable doubt. *Vaughn v. State*, 248 Ga. 127 (2) (281 SE2d 594) (1981).

9. A defense psychiatrist testified that Foster was so intoxicated from the ingestion of alcohol, marijuana and cocaine that he did not know the difference between right and wrong at the time of the crime. He also testified that Foster has an anti-social personality disorder, but that when he is sober he is neither insane nor mentally ill under Georgia law.

On cross-examination, the prosecutor asked the psychiatrist if it was true that most people in prison have an anti-social personality disorder. The psychiatrist agreed that it was true. Then the state asked:

> So any one of those people that took cocaine and marijuana and beer in the quantities by his story that you say that this defendant took it, would be entitled to walk out of the courtroom as found acquitted on the basis of insanity. Is that what you're saying?

Foster objected and moved for a mistrial. The trial court denied the mistrial, but sustained the objection and instructed the jury to

disregard the question. The court did not err by refusing to declare a mistrial.

10. The court charged on voluntary and involuntary intoxication as follows:

> Our law provides that voluntary intoxication shall not be an excuse for any criminal act. It provides further that if a person's mind when unexcited by intoxicants is capable of distinguishing between right and wrong and reason and acting rationally, and he voluntarily deprives himself of reason by consuming intoxicants and while under the influence of such intoxicants, he commits a criminal act, he is criminally responsible for such act to the same extent as if he were sober. Whether or not the defendant was voluntarily intoxicated at or during the time alleged in this indictment is a matter solely for you, the jury, to determine.

> A person shall not be found guilty of a crime when, at the time of the conduct constituting the crime, the person, because of involuntary intoxication, did not have sufficient mental capacity to distinguish between right and wrong in relation to the criminal act.

> Involuntary intoxication means intoxication caused by (a) consumption of a substance through excusable ignorance, or (b) the coercion, fraud, artifice or contrivance of another person.

These instructions set forth the principles contained in OCGA § 16-3-4.

Foster contends the court erred by refusing his request to charge in addition:

> If, because of the influence of alcohol, drugs, or narcotics, one's mind becomes so impaired as to render him incapable of forming an intent to do the act charged, or to understand that a certain consequence would likely result from it, he would not be criminally responsible for the act.

The law of intoxication contained in OCGA § 16-3-4 must be read in light of OCGA § 16-3-2, which provides:

> A person shall not be found guilty of a crime if, at the time of the act, omission, or negligence constituting the crime, the person did not have mental capacity to distinguish between right and wrong in relation to such act, omission or negli-

gence.

OCGA § 16-3-4 limits the reach of OCGA § 16-3-2 so that the inability to distinguish between right and wrong is *not* a defense if the inability is a consequence of voluntary intoxication (but remains a defense if the inability is a consequence of *in*voluntary intoxication).

Neither code section speaks of an inability *to form an intent* to commit the act. Persons are not excused from criminal liability under either of these code sections because they are incapable of forming criminal intent. As we observed in *Pope v. State*, 256 Ga., supra at 208, a person can be capable of forming an intent to kill but incapable of understanding the difference between right and wrong.[4] Lack of intent is a defense, but it is not implicated by either OCGA § 16-3-2 or OCGA § 16-3-4. In *Jones v. State*, 29 Ga. 594 (2) (1860), this court explained:

> [T]he minimum of mind which can furnish the necessary mental element in crime, is a far smaller quantity than was claimed by the argument for the accused. . . .
>
> Whoever . . . has mind enough to form the simple intention to kill a human being, has mind enough to have malice, and to furnish the mental constituents of murder. . . .
>
> And this brings [us] to a consideration of the great perversions which have been made of the doctrine that drunkenness is no excuse for crime. The foundation stone of these perversions, not distinctly shaped in the argument, but unconsciously assumed in it, is a feeling or notion that the exemption of insane persons and young children from criminal responsibility, is not the result of positive law excusing them, but is the simple consequence of their mental deficiency, which is supposed to be so complete as not to be capable of furnishing the mental element of crime; while the drunken man, with the same actual mental deficiency, is held responsible for his actions, not because they are crimes having the mental and physical element of crime, but by virtue of a certain *destructive* capacity infused into him, from reasons of policy, by the law which declares that drunkenness shall be no excuse for crime. The reverse of all this is the true philosophy of the law. The law deals with all of these classes of

---

[4] Foster's own psychiatrist testified that although Foster was incapable of distinguishing between right and wrong at the time of the crime, he *was* capable of forming the intent to do the acts he committed.

people, as having a sufficient quantum of mind to have bad passions, and evil intentions, and carelessness in their actions, and so to furnish the mental element of crime, but as laboring also under an infirmity of reason, which serves to betray them into these evil intentions and carelessness, and at the same time breaks down this power of resisting temptation. The law comes in then, and excuses the young and the insane, out of tenderness towards an infirmity which is involuntary, and at the same time, to guard against the possibility that men might make the same excuse whenever there is the same infirmity of reason, the law takes special care to exclude drunken men from the excuse, because their infirmity is voluntary.

The result is, that the young and the involuntary insane occupy a platform of their own, by virtue of an exception made in their favor, while the voluntary insanity of drunkenness being excluded from the exception, stands just as if no exception had been made, and the drunk man and sober man occupy the same great platform of responsibility for the crimes which they commit. . . .

Id. at 607-10.

Foster's requested charge is misleading, because it implies that the intoxication defense involves a lack of intent to commit the crime, when intent is, in fact, a separate issue.

The trial court charged on intent, including the state's burden to prove intent beyond a reasonable doubt. The court did not err by refusing to give in addition the defendant's requested charge on inability to form intent as a result of intoxication. *Gilreath v. State*, 247 Ga. 814 (13) (279 SE2d 650) (1981).

11. "The statutory provision that . . . mental illness be proved beyond a reasonable doubt is not constitutionally infirm. [Cit.]" *Spivey v. State*, 253 Ga. 187, 189 (319 SE2d 420) (1984).

12. The state urged the presence of two statutory aggravating circumstances at the sentencing phase of the trial: (1) the murder was committed while the offender was engaged in the commission of burglary, and (2) the murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim. OCGA § 17-10-30 (b) (2) and (b) (7). The court's charge included an instruction that if the jury should find the § b (7) circumstance, its verdict should specify which of the three elements of § b (7) — torture, depravity of mind, or an aggravated battery — the jury found. See *West v. State*, 252 Ga. 156, 162 (Appendix) (313 SE2d 67) (1984).

A type-written verdict form was submitted to the jury as follows:

The following aggravated circumstances as to Murder has [sic] been submitted by the State of Georgia and must have been proved to the satisfaction of the jury beyond a reasonable doubt before a verdict recommending the death penalty is authorized, to wit.

1. The offense of murder was committed while the offender was engaged in the commission of Burglary.

2. The offense of murder was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim.

The jury will answer the following questions:

1. Did you find beyond a reasonable doubt the aggravated circumstances to exist as to the murder?

2. If so, write the aggravated circumstances below as to murder.

3. As to murder: (A) We the jury recommend the death penalty. YES ( ) NO ( )

B. We the jury recommend Life Imprisonment. YES ( ) NO ( )

The jury filled in the form by writing "yes" after the first question, and by writing after the second question:

Torture — powdered body, eyes & nose, salad bottle in vagina, strangulation

Depravity of mind — powdered body, salad bottle in vagina, strangulation

Aggravated battery — hit with stick (log) disfigured face, strangulation

Finally, the jury checked "yes" to 3 (A) and drew a line through 3 (B).

The jury convicted Foster of burglary and answered "yes" to the question whether it had found beyond a reasonable doubt the proffered "aggravated circumstances" (plural), one of which was burglary. However, the jury failed to list burglary in the space provided under

the second "question." Although it is likely that the jury meant to find that the commission of the offense of burglary was a statutory aggravating circumstance of the murder, we cannot be sure that the jury intended to do so, and we shall not consider burglary as a statutory circumstance supporting the imposition of a death sentence. OCGA § 17-10-30 (c).

That leaves the § b (7) circumstance. Since no one at trial objected to the form of the verdict, the question here is not whether the form of the verdict might be objectionable, but whether "the jury's intent [was] shown with sufficient clarity that this court can rationally review the jury's finding." *Romine v. State*, 251 Ga. 208, 213 (305 SE2d 93) (1983). We are satisfied that the jury intended to find the § b (7) circumstance in its entirety and to follow the trial court's instructions by specifying in particular that it had found each of the three principal elements of § b (7). See *Hance v. State*, 245 Ga. 856 (3) (268 SE2d 339) (1980).

The evidence showed that Foster hit the victim with a fireplace log hard enough to break her jaw, sexually molested her, poured talcum powder all over her face, and then strangled her to death. The jury's § b (7) finding is supported by the evidence. OCGA § 17-10-35 (c) (2). Compare *Phillips v. State*, 250 Ga. 336 (6) (297 SE2d 217) (1982).

13. The death sentence was not imposed under the influence of passion, prejudice or other arbitrary factor, and is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. OCGA § 17-10-35 (c) (1) and (c) (3). The similar cases listed in the Appendix support the imposition of a death sentence in this case.

*Judgment affirmed. All the Justices concur.*

APPENDIX.

*Blankenship v. State*, 258 Ga. 43 (365 SE2d 265) (1988); *Crawford v. State*, 257 Ga. 681 (362 SE2d 201) (1987); *Parker v. State*, 256 Ga. 543 (350 SE2d 570) (1986); *Devier v. State*, 253 Ga. 604 (323 SE2d 150) (1984); *Allen v. State*, 253 Ga. 390 (321 SE2d 710) (1984); *Felker v. State*, 252 Ga. 351 (314 SE2d 621) (1984); *Brown v. State*, 250 Ga. 66 (295 SE2d 727) (1982); *Messer v. State*, 247 Ga. 316 (276 SE2d 15) (1981); *Justus v. State*, 247 Ga. 276 (276 SE2d 242) (1981); *Green v. State*, 246 Ga. 598 (272 SE2d 475) (1980); *Cape v. State*, 246 Ga. 520 (272 SE2d 487) (1980); *Thomas v. State*, 245 Ga. 688 (266 SE2d 499) (1980); *Gates v. State*, 244 Ga. 587 (261 SE2d 349) (1979); *Brooks v. State*, 244 Ga. 574 (261 SE2d 379) (1979); *Collins v. State*, 243 Ga. 291 (253 SE2d 729) (1979); *Davis v. State*, 242 Ga. 901 (252 SE2d 443) (1979); *Johnson v. State*, 242 Ga. 649 (250 SE2d 394) (1978); *Moore v. State*, 240 Ga. 807 (243 SE2d 1) (1978); *Gibson v. State*, 236 Ga. 874 (226 SE2d 63) (1976).

748

DECIDED NOVEMBER 22, 1988 — RECONSIDERATION DENIED
DECEMBER 14, 1988.

*James C. Wyatt, Robert K. Finnell,* for appellant.
*Stephen F. Lanier, District Attorney, Michael J. Bowers, Attorney General, Paula K. Smith, Assistant Attorney General,* for appellee.