[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-11928
_____

D.C. Docket No. 2:06-cv-00062-WCO


TOMMY LEE WALDRIP,

                    Petitioner - Appellant,

versus

CARL HUMPHREY,

                    Respondent - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(August 21, 2013)

Before BARKETT, HULL, and WILSON, Circuit Judges.

PER CURIAM:

    Tommy Lee Waldrip appeals the district court's denial of his petition for

habeas corpus after being convicted and sentenced to death for the murder of Keith

Evans.[1]  The district court granted a Certificate of Appealability (COA),[2] which we

expanded to include the following issues:

1. Is petitioner's Summary Report *Brady* [*v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963),] claim procedurally defaulted and if it is not, was the Georgia Supreme Court's determination that the Summary Report [prepared by Assistant District Attorney (ADA) Raymond George] was inadmissible hearsay and would not lead to admissible evidence an incorrect or unreasonable application of federal law?
2. Whether the state court's decision that petitioner's constitutional rights were not violated under *Edwards v. Arizona*, 451 U.S. 477[, 101 S. Ct. 1880] (1981), is an unreasonable application of federal law.
3. Whether the state court's decision that petitioner's custodial confessions were not involuntary is an unreasonable application of federal law.
4. Was the state court's decision that petitioner's trial counsel was not constitutionally ineffective for failing to present appropriate mitigating evidence at the sentencing phase an incorrect or unreasonable application of federal law?

## I.  BACKGROUND

### A.  Facts

On the evening of April 13, 1991, two days before he was scheduled to

testify in an unrelated armed robbery trial against Waldrip's son, John Mark

Waldrip, Keith Evans did not return home from work.  Around midnight, Evans's

unoccupied truck was found burning in a remote area.  A current automobile

---

[1] Waldrip was convicted of: (1) malice murder, (2) two counts of felony murder, (3) kidnapping with bodily injury, (4) aggravated battery, (5) five counts of aggravated assault, (6) theft by taking a motor vehicle, (7) arson in the second degree, (8) influencing a witness, (9) concealing a death, (10) possession of a firearm by a convicted felon, and (11) two counts of possession of a firearm during the commission of a felony.

[2] Waldrip's final claim—whether he "establish[ed] cause and prejudice to excuse the procedural default of his incompetence to stand trial claim"—is deemed abandoned, as he did not address the issue in his brief.  *See United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003).

2

insurance card for a Ford Tempo, registered in the name of Waldrip's wife, was found near the burning vehicle.

On April 14, 1991, Georgia Bureau of Investigation (GBI) Special Agent Jimmy Berry and Dawson County Sheriff Randy Chester—a close, personal friend of the Evans family—interviewed Waldrip and his wife at their home. Police questioned Waldrip about his whereabouts without issuing any warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966). Later that day, while executing a search warrant on the Ford Tempo, Berry and former ADA George again asked Waldrip for information about the Evans disappearance. Waldrip requested counsel, and no further questioning occurred.

On April 16, 1991, law enforcement arrested Waldrip for an unrelated probation violation and transported him to the Dawson County Jail. Berry read Waldrip his *Miranda* rights, gave Waldrip a form listing those rights, and obtained a waiver. Berry then questioned Waldrip for 15 to 20 minutes. Waldrip did not request an attorney, but invoked his right to remain silent and the interview ended. However, according to a Summary Report—written by former ADA George, and which was not disclosed to the defense until Waldrip's state post-conviction proceedings—Sheriff Chester allegedly interviewed Waldrip minutes after he arrived at the jail but prior to his interview with Berry. The Summary Report

stated that Waldrip requested counsel during that April 16 interview with Sheriff Chester at the jail.[3]

On April 17, 1991, while Waldrip was in custody, a visibly upset and tearful Sheriff Chester went to Waldrip's cell. Without administering *Miranda* warnings, Sheriff Chester asked about the location of Evans's body.[4] Waldrip remained silent, and Sheriff Chester left Waldrip's cell.[5] Around 8:30 a.m. the next morning, Waldrip asked to speak to Sheriff Chester. When the Sheriff arrived, Waldrip divulged the general location of Evans's body. At no point during the exchange did Sheriff Chester administer any *Miranda* warnings.

Approximately two hours later, GBI Special Agent Tim Attaway went to Waldrip's cell. After receiving *Miranda* warnings and executing a waiver, Waldrip led authorities to the location of Evans's body and, later, to the location of the shotgun used in the murder. During further interrogations conducted on April 18, 1991, and after receiving *Miranda* warnings and waiving his rights each time, Waldrip eventually confessed that he, John Mark, and Howard Livingston, Waldrip's brother-in-law, shot Evans, beat him to death, buried him in a shallow

---

[3] The statement in the Summary Report reads: "Tommy was initially interviewed by Sheriff Chester[.] However, he asked for an attorney and the interview was terminated."

[4] Chester said, "Tommy, I am a Christian man, and . . . you claim to be Christian too . . . please help me find where Keith Evans is at, because . . . if he is somewhere he may be starving to death . . . we have got to know, and I have got to relieve—help this family relieve some of their grief."

[5] As he left, Sheriff Chester yelled, "May God help you."

4

grave, and burned his truck.  On April 19, 1991, after receiving *Miranda* warnings and waiving his rights, Waldrip gave a conflicting statement that John Mark and Livingston murdered Evans and burned his truck, and that he was merely a bystander.  In a third *Mirandized* statement given on April 22, 1991, Waldrip again stated that all three individuals participated in the crimes.

## B.  Procedural History

On May 10, 1991, after attorneys J. Richardson Brannon and Anne Watson were appointed as counsel,[6] Waldrip moved to suppress his post-arrest statements on the grounds that, *inter alia*, law enforcement violated his *Miranda* rights and that mental illness prevented him from competently executing a waiver.  On June 29, 1993, the trial court ruled that Waldrip's pre-*Miranda* statements to Sheriff Chester and the directions to the location of Evans's body were inadmissible, but that Waldrip's post-*Miranda* statements to Agent Attaway and the other GBI agents during the April 18–22 interrogations were voluntary and not coerced, and therefore admissible.  In a joint interim appeal to the Georgia Supreme Court, Waldrip again challenged the voluntariness of his statements on mental illness grounds, and claimed that the state's repeated *Miranda* violations and coercive tactics undermined his ability to effectuate a voluntary waiver.  The Georgia

---

[6] Watson moved to Montana in August 1992, two years before Waldrip's trial.  Don Pulliam, a contract attorney, was appointed to assist part-time with the trial.

Supreme Court affirmed the denial of relief for the same reasons articulated by the trial court. *See Livingston v. State*, 444 S.E.2d 748, 754 (Ga. 1994).

After a five-day hearing on September 12–16, 1991—at which prosecution mental health experts, as well as defense psychological expert Dr. John Currie, testified—a jury found Waldrip competent to stand trial. During the guilt phase, Dr. Currie again testified about Waldrip's mental health issues; however, the jury found Waldrip guilty. During the penalty phase, Watson presented eight friends and family members as character witnesses, but did not present any mental health evidence. The jury sentenced him to death. On direct appeal, the Georgia Supreme Court affirmed Waldrip's conviction and death sentence. *Waldrip v. State*, 482 S.E.2d 299, 313 (Ga. 1997). The United States Supreme Court denied certiorari. *Waldrip v. Georgia*, 522 U.S. 917, 118 S. Ct. 305 (1997).

Waldrip filed a petition for writ of habeas corpus in state court on March 17, 1998, alleging, *inter alia*, *Brady* and voluntariness violations, as well as ineffective assistance of counsel. On June 8, 2004, after an evidentiary hearing and the submission of numerous affidavits regarding Waldrip's mental health issues from trial counsel, psychological experts, and family members, the state habeas court denied all claims after concluding that: (1) that Waldrip's *Brady* claim was procedurally defaulted; (2) notwithstanding that default, the Summary Report was

6

not *Brady* material[7]; and (3) Waldrip's trial counsel was not ineffective at the penalty phase.

The Georgia Supreme Court granted Waldrip's application for a certificate of probable cause to appeal and affirmed the denial of relief on alternative grounds. The Georgia Supreme Court did not apply any procedural default but reached the merits of Waldrip's *Brady* claim. As to the state habeas court's analysis "that the 'Summary Report' was not *Brady* material," the Georgia Supreme Court expressly noted several deficiencies in the state habeas court's reasoning that it was not *Brady* material. *Waldrip v. Head*, 620 S.E.2d 829, 832–33 (Ga. 2005). First, the Georgia Supreme Court pointed out that the state habeas court's reliance on *Foster v. State*, 374 S.E.2d 188 (1988), was misplaced as the Georgia Supreme Court "explicitly noted in *Foster* that that case did not involve the constitutional right to exculpatory information under *Brady*." *Id.* at 832. As another deficiency in the state habeas court's not-*Brady*-material analysis, the Georgia Supreme Court pointed out: (1) "the [state] habeas court's analysis fail[ed] to address *the possibility* that the 'Summary Report' could have been used at trial as admissible evidence of the Sheriff's *own* knowledge of Waldrip's alleged request for counsel"; and (2) that "[i]t is one thing to say the State had no constitutional duty

---

[7] The state habeas court found that the Summary Report "was not *Brady* material but, instead, constituted work product of the State and, as such, was not discoverable by the defense." The court also found that the Summary Report was not *Brady* material because Waldrip himself "was aware that he told law enforcement that he wanted to speak to an attorney."

7

to remind a defendant of his or her own pretrial allegations of fact contained in his or her own statement to law enforcement officers, but it would be another case altogether if the state failed to disclose evidence confirming the defendant's allegations." *Id.* (first emphasis added).

The Georgia Supreme Court implicitly ruled that the Summary Report was suppressed *Brady* material, which is why that Court then turned to an examination of whether Waldrip was prejudiced by the suppression of the Summary Report. The Georgia Supreme Court concluded that Waldrip could not prove prejudice under *Brady* because the Summary Report was "the written hearsay statement of its author [ADA George]" and was also "quite possibly double hearsay" and thus inadmissible at Waldrip's trial. *Id.* at 833. In other words, even if the Summary Report was turned over and not suppressed, the Georgia Supreme Court explained why the report was inadmissible at trial to support any of Waldrip's claims. The Georgia Supreme Court held that "[i]n light of the complete absence of admissible evidence showing any prejudice to Waldrip's defense at trial, this individual claim does nothing to contribute to a showing of overall prejudice arising from suppressed evidence." *Id.*

The United States Supreme Court again denied certiorari. *Waldrip v. Terry*, 547 U.S. 1016, 126 S. Ct. 1605 (2006). Waldrip filed a timely petition for writ of habeas corpus in federal court on May 1, 2006. On March 30, 2011, the district

8

court denied habeas relief on all claims.[8] *Waldrip v. Terry*, N.D. Ga. 2011, (No. 06-00062, Mar. 30, 2011).

## II.  STANDARD OF REVIEW

"We review *de novo* a district court's grant or denial of a habeas corpus petition.  The district court's factual findings are reviewed for clear error, while mixed questions of law and fact are reviewed *de novo*."  *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005) (citations omitted).  "An ineffective assistance of counsel claim is a mixed question of law and fact subject to de novo review."  *Id.*

"Federal habeas review of a petitioner's claim is typically precluded when the petitioner procedurally defaulted on or failed to exhaust the claim in state court."  *Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1284 (11th Cir. 2012), *cert. denied*, 133 S. Ct. 1625 (2013).  "[I]n order to exhaust state remedies, a petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review."  *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010).  "Whether a particular claim is subject to the doctrine of procedural default is a mixed question of fact and law, which we review de novo."  *Doorbal v. Dep't of Corr.*, 572 F.3d 1222, 1227 (11th Cir. 2009) (alterations and internal quotation marks omitted).

---

[8] The district court held that: (1) Waldrip's *Edwards* claim was procedurally defaulted; (2) Waldrip was not entitled to an evidentiary hearing on his *Edwards* claim; and (3) Waldrip's *Brady* claim was not procedurally defaulted.  *Waldrip*, N.D. Ga. 2011, (No. 06-00062, Mar. 30, 2011).

The doctrine of procedural default dictates that "[a] state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim," but only "if the state procedural ruling rests upon [an] 'independent and adequate' state ground." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001). To determine whether a state court's disposition of a claim warrants such preclusive effect, the ruling must satisfy the following standard: (1) "the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim"; (2) "the state court's decision must rest entirely on state law grounds and not be intertwined with an interpretation of federal law"; and (3) "the state procedural rule must be adequate, i.e., firmly established and regularly followed and not applied in an arbitrary or unprecedented fashion." *Ward*, 592 F.3d at 1156–57 (internal quotation marks omitted). In addition, the "procedural default rule does not preclude federal habeas review of a petitioner's constitutional claim if the state court adjudicates the federal claim on the merits." *Remeta v. Singletary*, 85 F.3d 513, 516 (11th Cir. 1996). However, "where a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the state procedural bar and

10

decline to reach the merits of the claim." *Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir. 1994).

Because the Georgia Supreme Court ruled on the merits of Waldrip's *Brady*, *Edwards*, and voluntariness claims, *see Waldrip*, 620 S.E.2d at 833, and the state habeas court reached the merits of Waldrip's ineffective assistance of counsel claim,[9] we review all claims under the deferential Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See Ward*, 592 F.3d at 1155. AEDPA precludes federal courts from granting habeas relief on claims that were previously adjudicated on the merits in state court unless the adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). The United States Supreme Court has distinguished between the two clauses as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct

---

[9] Because the Georgia state habeas court was the "last state court [to] render[] judgment" on Waldrip's penalty phase ineffective assistance of counsel claim, we look to that court's ruling on the issue. *See Ward*, 592 F.3d at 1156.

governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412–13, 120 S. Ct. 1495, 1523 (2000); *see Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001) (quoting *Williams*, 529 U.S. at 412–13, 120 S. Ct. at 1523).

Normally, § 2254(d)(1) imposes a "highly deferential standard for evaluating state-court rulings, . . . which demands that state-court decisions be given the benefit of the doubt." *Ponticelli v. Fla. Dep't of Corr.*, 690 F.3d 1271, 1291 (11th Cir. 2012) (internal quotation marks omitted), *cert. denied*, 81 U.S.L.W. 3702 (2013). However, "[w]here we have determined that a state court decision is an unreasonable application of federal law under 28 U.S.C. § 2254(d)[1], we are unconstrained by § 2254's deference and must undertake a *de novo* review of the record." *McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252, 1266 (11th Cir. 2009).

> To determine whether the state court unreasonably applied clearly established federal law in adjudicating [Waldrip's] habeas petition, this Court must conduct the two-step analysis that the Supreme Court set forth in *Harrington v. Richter*, — U.S. —, 131 S. Ct. 770 (2011). First, this Court must determine what arguments or theories supported or, [if none were stated], could have supported the state court's decision. Second, this Court must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court. In other words, we may issue a writ of habeas corpus only when the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well

> understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Ponticelli*, 690 F.3d at 1291 (citations and internal quotation marks omitted) (alterations in original); *see Hill v. Humphrey*, 662 F.3d 1335, 1346 (11th Cir. 2011) (en banc) ("Phrased more simply and maybe a little more clearly: if some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied." (internal quotation marks omitted)).

Under § 2254(d)(2), "[t]he question whether a state court errs in determining the facts is a different question from whether it errs in applying the law." *Rice v. Collins*, 546 U.S. 333, 342, 126 S. Ct. 969, 976 (2006); *see Ponticelli*, 960 F.3d at 1291. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Similar to the "unreasonable application" prong, "[a] state court's . . . determination of the facts is unreasonable only if no fairminded jurist could agree with the state court's determination or conclusion." *Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1257 (11th Cir. 2012) (internal quotation marks omitted), *cert. denied*, 81 U.S.L.W. 3679 (2013).

13

## III. DISCUSSION

### A. Summary Report

Waldrip first argues that the Summary Report conclusively proves that he requested counsel while in custody before making any incriminating statements, and that the state violated *Brady* by failing to disclose the report. Second, Waldrip avers that because the Summary Report was admissible and proved that he requested counsel immediately after he was arrested, all of the un-counseled custodial interrogations that followed contravened *Edwards* and violated his Sixth Amendment rights. We will address each argument in turn.

### 1. *Brady* Claim

Waldrip contends that the Georgia Supreme Court unreasonably applied clearly established federal law when it concluded that the Summary Report was inadmissible hearsay and therefore per se immaterial. *Brady* requires that the prosecution turn over all "evidence favorable to an accused." 373 U.S. at 87, 83 S. Ct. at 1196. To successfully make out a claim for relief under *Brady*, Waldrip must establish that: (1) "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) the evidence was "suppressed by the State"; and (3) "prejudice . . . ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S. Ct. 1936, 1948 (1999).

Contrary to Waldrip's contentions, there is no holding by the Georgia

14

Supreme Court that the Summary Report was not *Brady* material.  Indeed, the Georgia Supreme Court pointed out several deficiencies in the state habeas court's reasoning about whether the Summary Report was *Brady* material.  The Georgia Supreme Court's hearsay analysis related to the prejudice prong of Waldrip's *Brady* claim, not to whether the evidence was exculpatory or favorable to Waldrip in the first place. The Georgia Supreme Court effectively agreed with Waldrip that the Summary Report was suppressed *Brady* material.  The Georgia Supreme Court then held that Waldrip's *Brady* claim failed on the third *Brady* prong—prejudice— because the Summary Report was inadmissible hearsay evidence and Waldrip had failed to show any specific lawful use to which the Summary Report could have been put at his trial.[10]  Therefore, the Summary Report could not have, in reasonable probability, altered the outcome of his trial.  *Waldrip*, 620 S.E.2d at 832–33, 835–36.

Before addressing the Georgia Supreme Court's prejudice-prong conclusion, we note that *Brady* evidence often comes in the form of written court statements

---

[10] The Georgia Supreme Court noted that former ADA George did not recall the basis for his notation that Waldrip requested counsel after being arrested.  The court concluded:

> Given Waldrip's failure to show the relevant statement in the "Summary Report" to be anything other than hearsay and quite possibly double hearsay, his failure to attempt any showing of why the general exclusion of hearsay should not apply in this case, and his failure to show any specific lawful use of the statement, the statement in the "Summary Report" must be regarded as completely inadmissible and without probative value.

*Waldrip*, 620 S.E.2d at 833.

15

that appear to be hearsay evidence on their face.  Indeed, the Supreme Court has routinely found material such as notes in a police investigation file similar to the Summary Report to be subject to *Brady*, its apparent hearsay qualities notwithstanding.  *See, e.g.*, *Smith v. Cain*, — U.S. —, 132 S. Ct. 627, 630–31 (2012) (investigating detective's notes containing witness statements); *Strickler*, 527 U.S. at 282, 119 S. Ct. at 1948–49 (materials in police files, including notes by a detective and letters from a witness); *Kyles v. Whitley*, 514 U.S. 419, 441, 115 S. Ct. 1555, 1569 (1995) (witness and informant statements to the police, both written and oral); *cf. Brady*, 373 U.S. at 84, 83 S. Ct. at 1195 (witness's out-of-court statements); *Moore v. Illinois*, 408 U.S. 786, 791–93, 92 S. Ct. 2562, 2566–67 (1972) (out-of-court witness statements, picture of alleged suspect, extrajudicial statement of prosecutor, and out of court written statements and drawing by witness).  The Georgia Supreme Court properly concluded the Summary Report was *Brady* material suppressed by the state.

The question here then is whether the Georgia Supreme Court's decision that Waldrip did not show prejudice is "contrary to" or "involve[d] an unreasonable application of[] clearly established Federal law."  28 U.S.C. § 2254(d)(1).  Even if the state had disclosed the Summary Report to Waldrip before his suppression hearing, and even assuming it was admissible, he has not shown a "reasonable probability" that the outcome of his suppression hearing or his jury trial would

16

have been different. *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985). Throughout all of these proceedings, Waldrip has never himself stated—through affidavit, deposition, or live testimony—that he ever requested counsel, a fact within his own knowledge. Moreover, on the same day that he was arrested, Waldrip waived counsel in writing. Former ADA George did not personally witness Waldrip request counsel, nor could George recall the exact source or exactly how he learned of that information. Sheriff Chester also testified that he did not recall ever interviewing Waldrip on April 16. Even now, there is nothing in the record that shows Waldrip requested counsel, aside from the cursory reference in the Summary Report itself.

In the absence of any testimony supporting Waldrip's allegation that he actually requested counsel, and in light of all the contrary evidence, we cannot say that the Summary Report, in and of itself, is sufficient to create a reasonable probability that the outcomes of the pre-trial suppression hearing or the trial would have been different. We therefore cannot conclude that the suppression of the Summary Report "undermines confidence in the outcome" of the suppression hearing or the trial. *Kyles*, 514 U.S. at 434, 115 S. Ct. at 1566 (internal quotation marks omitted). Accordingly, Waldrip's *Brady* claim fails because the Georgia Supreme Court's prejudice ruling is not an unreasonable application of clearly established federal law.

17

**2.  *Edwards* Claim**

Waldrip alleges that because the Summary Report establishes that he requested counsel when Sheriff Chester spoke to him on April 17, 1991, all subsequent interrogation by law enforcement occurred in violation of *Edwards*. *Edwards* mandates that once "an accused . . . ha[s] expressed his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  451 U.S. at 484–85, 101 S. Ct. at 1885.  Moreover,  *Edwards* establishes "that when an accused has invoked his right to . . . counsel . . ., a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he ha[d] been advised of his rights." *Id.* at 484, 101 S. Ct. at 1884–85.

In *Edwards*, however, there was no question about whether the defendant had invoked his right to counsel. *Id.* at 479, 101 S. Ct. at 1882.  Instead, the primary focus of the case was whether Edwards made a voluntary, knowing, and intelligent waiver of that invocation—such that his incriminating statements and confession were admissible—when he spoke to police officers who had reinitiated post-invocation questioning. *Id.* at 479, 101 S. Ct. at 1882.  Here, in an effort to make out a valid *Edwards* claim, Waldrip asks that we engage in conjecture and

18

presume the truth of the Summary Report's contents: that he did, in fact, invoke his right to counsel. Based on the evidence before us, however, we cannot do that. Both Georgia state courts recognized, and we concur, that there is no other evidence in the record, outside of the Summary Report, that Waldrip requested counsel. Once again, Waldrip's failure to state—either through affidavit, deposition, or live testimony—that he ever requested counsel is as fatal to his *Edwards* claim as it is to his *Brady* claim. Accordingly, the Georgia Supreme Court did not unreasonably apply clearly established federal law in denying Waldrip's *Edwards* claim.

## B. Voluntariness of Confessions

Waldrip further contends that the Georgia Supreme Court engaged in an unreasonable application of clearly established federal law and an unreasonable interpretation of the facts when it failed to engage in a "totality of the circumstances" analysis to determine whether his custodial statements on April 18–22, 1991, constituted a knowing and voluntary waiver of his right to remain silent.

When law enforcement officers conduct a custodial interrogation of a suspect without the benefit of *Miranda* warnings, there is a presumption that the suspect's statements are compelled. *See Arizona v. Roberson*, 486 U.S. 675, 681, 107 S. Ct. 2093, 2087 (1988) ("[T]he prophylactic protections that the *Miranda*

warnings provide [are] to counteract the inherently compelling pressures of custodial interrogation." (internal quotation marks omitted)).  However, "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Oregon v. Elstad*, 470 U.S. 298, 314, 105 S. Ct. 1285, 1296 (1985).  As such, the admissibility of any subsequent statement turns on whether, under the totality of the circumstances, the subsequent statement was knowingly and voluntarily made.  *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S. Ct. 2041, 2047 (1973); *see also United States v. Gonzalez-Lauzan*, 437 F.3d 1128, 1134 (11th Cir. 2006).  When looking at the totality of the circumstances, we consider "the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." *Hubbard v. Haley*, 317 F.3d 1245, 1253 (11th Cir. 2003).  There is a presumption that, "[o]nce warned, the suspect is free to exercise his own volition in deciding whether or not to make a statement to the authorities." *Gonzalez-Lauzan*, 437 F.3d at 1133 (internal quotation marks omitted).

Although both state habeas courts concluded that Waldrip's un-*Mirandized* statements to Sheriff Chester regarding the location of Evans's body were inadmissible, the courts did a thorough job reviewing each contact between

20

Waldrip and law enforcement and, under the totality of the circumstances, parsing the contacts that were proper from those that were not. Contrary to Waldrip's contention, the courts considered the totality of the circumstances, as well as his IQ and alleged mental illness. Like the Georgia Supreme Court, we conclude that, notwithstanding Sheriff Chester's violation of Waldrip's *Miranda* rights, Waldrip's subsequent, *Mirandized* statements on April 19–22, 1991, were knowingly and voluntarily made. The thorough analysis conducted by the state habeas courts, in conjunction with the remainder of the record, are more than sufficient to establish that Waldrip "exercise[d] his own volition in deciding whether or not to make a statement to the authorities." *Id.* at 1133 (internal quotation marks omitted). As such, we cannot say that the Georgia Supreme Court unreasonably applied clearly established federal law in concluding as such.

## C.  Ineffective Assistance of Counsel

Waldrip finally contends that Anne Watson—the attorney who was primarily responsible for the penalty phase of trial—conducted an unreasonable, eleventh-hour, truncated mitigation investigation. Waldrip argues that despite his obvious mental health issues exhibited during attorney-client meetings, and despite defense counsel's decision to file a pre-trial special plea of incompetency to stand trial, Watson's failure to present any mental health evidence whatsoever at the penalty phase was deficient and prejudicial, and not simply a strategic decision.

21

In order to prove that Watson rendered ineffective assistance at the penalty phase, Waldrip "must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984)). A court need not "address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

### 1. Performance

"To establish deficient performance, a petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness." *Wiggins*, 539 U.S. at 521, 123 S. Ct. at 2535 (internal quotation marks omitted). In making such an assessment, we must inquire "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066. Our review of counsel's conduct is highly deferential, and "we must indulge a strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment." *Newland v. Hall*, 527 F.3d 1162, 1184 (11th Cir. 2008) (internal quotation marks omitted).

22

"The failure to conduct a reasonable investigation of possible mitigating evidence may render counsel's assistance ineffective." *Clark v. Dugger*, 834 F.2d 1561, 1568 (11th Cir. 1987). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066, and has an "obligation to conduct a thorough investigation of the defendant's background." *Williams v. Taylor*, 529 U.S. 362, 396, 120 S. Ct. 1495, 1515 (2000). "In assessing counsel's investigation, we must conduct an objective review of their performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins*, 539 U.S. at 523, 123 S. Ct. at 2536 (citation and internal quotation marks omitted). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91, 104 S. Ct. at 2066.

We conclude that the record is insufficient to overcome the high deference that we afford counsel's conduct. *See Newland*, 527 F.3d at 1184. Here, neither Watson's mitigation investigation nor her penalty phase representation "fell below

23

an objective standard of reasonableness." *Wiggins*, 539 U.S. at 521, 123 S. Ct. at 2535 (internal quotation marks omitted).

Both Watson and Brannon espoused the same strategic goals in their use of Waldrip's mental health evidence: attempting to show that Waldrip's mental illness predisposed him to protect his family, even if it meant confessing to crimes that he did not actually commit. The same jury that sat during the penalty phase heard Dr. Currie's guilt-phase testimony regarding Waldrip's mental illness, including evidence of Waldrip's delusions about a monitoring system, hearing voices, bodily radiation, and an apparent conspiracy against him. Moreover, counsel elicited much of the specific testimony from Dr. Currie that Waldrip now claims should have been presented: that Waldrip was in the "upper part of the mentally retarded range, to the lower part of the borderline range," and that Waldrip suffered from "delusional disorder and psychotic disorder." While every minute detail of Waldrip's background was not presented to the jury during the penalty phase, the jury heard from multiple family members and friends who testified as character witnesses, all of whom testified in keeping with counsel's penalty phase strategy to "present evidence to paint [Waldrip] in a sympathetic light with the jury." Finally, while it is true that the guilt and penalty phases are two distinct stages of trial, it is clear that defense counsel conducted a pre-trial mitigation investigation into Waldrip's mental health and delusions in order to

24

present such testimony during the guilt phase, and that such mental health investigations dated back prior to the pre-trial competency hearing.

Because we conclude that Watson's mitigation investigation and her penalty-phase performance were not deficient, and that the state habeas court did not unreasonably apply clearly established federal law or make an unreasonable determination of the facts, we need not reach the issue of prejudice. *See Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069 ("[T]here is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one.").

## IV. CONCLUSION

For the foregoing reasons, we affirm the denial of habeas relief.

**AFFIRMED.**

25

BARKETT, Circuit Judge, concurring in the result only:

I concur in the majority's opinion with the exception of its discussion of Mr. Waldrip's *Brady* claim, which misapprehends the law of *Brady v. Maryland*, 373 U.S. 83 (1963), and fails to acknowledge that a state court cannot use its evidentiary rules to deny a defendant's constitutional rights.

Initially, I do not agree with the majority's statement that: "[t]he Georgia Supreme Court implicitly ruled that the Summary Report was suppressed *Brady* material, which is why that Court then turned to an examination of whether Waldrip was prejudiced by the suppression of the Summary Report." Slip Op. at 8. The question of whether suppressed evidence prejudiced a defendant is not segregable from the question of whether it constitutes *Brady* material in the first instance. As the Supreme Court has explained, there are three "*essential* components of a *Brady* violation": 1) "[t]he evidence at issue must be favorable to the accused . . ."; 2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; 3) "and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 280-82 (1999)(emphasis added). As each of these components is "essential," evidence does not become subject to the *Brady* due process protections unless all three components are present. In other words, each component is a necessary condition for a court to find that a particular piece of evidence constituted *Brady* evidence. As Justice Stevens wrote for the Court,

26

"strictly speaking, there is never a real 'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id*. at 281 The Georgia Supreme Court recognized that two of the three necessary conditions of a *Brady* violation were present in this case, namely that the Summary Report was favorable to Mr. Waldrip and that it was suppressed by the government. But by holding that Mr. Waldrip was not prejudiced by the suppression of the Summary Report, the Georgia Supreme court necessarily held that the suppression of the Summary Report *did not constitute Brady* material. Thus, I think it is inaccurate to say the Georgia Supreme Court implicitly found that the Summary Report was *Brady* material.

That point aside, I think the reasoning by which the Georgia Supreme Court reached its conclusion that Mr. Waldrip was not prejudiced by the nondisclosure of the Summary Report constituted an unreasonable application of federal law. While we do not sit in appellate review of a state court applying state evidentiary law, we have a duty to ensure that the application of state law does not serve to deny a habeas petitioner's federal constitutional rights. *See Breedlove v. Moore*, 279 F.3d 952, 963 (11th Cir. 2002); *see also Jones v. Cain*, 600 F.3d 527, 536 (5th Cir. 2010) ("Regardless of how a state court applies state evidence rules, a federal habeas court has an independent duty to determine whether that application

27

violates the Constitution."). By applying Georgia evidentiary law to find that the failure to disclose the Summary Report was not prejudicial, the Georgia Supreme Court impermissibly narrowed the scope of what can constitute *Brady* evidence. *Brady* evidence often comes in the form of written out of court statements that appear to be hearsay evidence on their face.[1] To hold that material of this kind is exempt from *Brady* disclosure requirements because it is hearsay evidence narrows the scope of *Brady* in violation of Supreme Court precedent and would impermissibly exclude a wide swath of exculpatory and probative evidence. Indeed, the Supreme Court has routinely found material such as notes in a police investigation file similar to the Summary Report to be subject to *Brady*, its apparent hearsay qualities notwithstanding. *See, e.g.*, *Smith v. Cain*, 132 S. Ct. 627 (2012) (investigating detective's notes containing witness statements); *Strickler*, 527 U.S. at 273-75 (1999) (materials in police files including notes by a detective and letters from a witness); *Kyles v. Whitley*, 514 U.S. 419 (1995) (witness and informant statements to the police, written and oral); *cf. Moore v. Illinois*, 408 U.S.

---

[1] Note that while the Summary Report is hearsay on its face, it qualifies under Georgia law as an exception to the hearsay rule as a party-opponent admission. O.C.G.A. § 24-3-31 (2012) (repealed January 1, 2013) ("The admission by a party to the record shall be admissible in evidence when offered by the other side[.]"); O.C.G.A. § 24-3-33 (2012) (repealed January 1, 2013)("Admissions by an agent or attorney in fact, during the existence and in pursuance of his agency, shall be admissible against the principal."). Whether Mr. George had personal knowledge of Mr. Waldrip's request is irrelevant as party-opponent admissions are admissible not because "the party making them[] is speaking from his personal knowledge, but upon the ground that a party will not make admissions against himself unless they are *true*." *Mayo v. Owen*, 208 Ga. 483, 486 (1951) (internal quotation omitted).

786 (1972) (out-of-court witness statements, picture of alleged suspect, extrajudicial statement of prosecutor, and out of court written statements and drawing by witness); *Brady*, 373 U.S. at 83 (witness's out-of-court statements). A state court cannot use its evidentiary rules to deny an individual access to a fundamental constitutional right, especially one that the Supreme Court has so consistently held to apply in factually similar situations. Therefore, the Georgia Supreme Court's holding that the Summary Report was not *Brady* evidence because it was hearsay is an unreasonable application of federal law and we must therefore review his *Brady* claim *de novo*. *McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252, 1266 (11th Cir. 2009).

Nonetheless, I agree that under *de novo* review, Mr. Waldrip cannot establish that he was prejudiced by the nondisclosure of the Summary Report and his *Brady* claim fails as a result.