Justice THOMAS, dissenting.
Thirty years ago, Timothy Foster confessed to murdering Queen Madge White after sexually assaulting her with a bottle of salad dressing. In the decades since, Foster has sought to vacate his conviction and death sentence on the ground that prosecutors violated Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), when they struck all black prospective jurors before his trial. Time and again, the state courts have rejected that claim. The trial court twice rejected it, and the Supreme Court of Georgia unequivocally rejected it when Foster directly appealed his conviction and sentence. Foster v. State, 258 Ga. 736, 736, n. 1, 738-739, 374 S.E.2d 188, 190, n. 1, 192 (1988), cert. denied, 490 U.S. 1085, 109 S.Ct. 2110, 104 L.Ed.2d 671 (1989). A state habeas court rejected it in 2013. App. 175-176, 192-196. And most recently, the Supreme Court of Georgia again rejected it as lacking "arguable merit," Ga. Sup.Ct. Rule 36 (2001). See App. 246.
Yet, today-nearly three decades removed from voir dire -the Court rules in Foster's favor. It does so without adequately grappling with the possibility that we lack jurisdiction. Moreover, the Court's ruling on the merits, based, in part, on new evidence that Foster procured decades after his conviction, distorts the deferential Batson inquiry. I respectfully dissent.
I
Federal law authorizes us to review the "judgments or decrees rendered by the highest court of a State in which a decision could be had," 28 U.S.C. § 1257(a), but only if such a judgment or decree raises a question of federal law, Michigan v. Long, 463 U.S. 1032, 1038, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). The Court today errs by assuming that the Supreme Court of Georgia's one-line order-the "judgmen[t] ... rendered by the highest court of a State in which a decision could be had," § 1257 -raises such a question. See ante, at 1745 - 1746. The far more likely explanation for the court's denial of habeas relief is that Foster's claim is procedurally barred. This disposition is ordinarily a question of state law that this Court is powerless to review. Before addressing the merits of Foster's Batson claim, the Court should have sought clarification that the resolution of a federal question was implicated in the Georgia high court's decision.
*1762A
The Supreme Court of Georgia's order in this case states in full: "Upon consideration of the Application for Certificate of Probable Cause to appeal the denial of habeas corpus, it is ordered that it be hereby denied." App. 246. Neither that order nor Georgia law provides adequate assurance that this case raises a federal question.
Under Georgia law, a state prisoner may file a state habeas petition in a state superior court. Ga.Code Ann. §§ 9-14-41 to 9-14-43 (2015). If the state superior court denies the petition, then the prisoner may appeal to the Supreme Court of Georgia, which has exclusive jurisdiction over habeas corpus cases, by timely filing a notice of appeal in the superior court and applying for a certificate of probable cause in the supreme court. See Fullwood v. Sivley, 271 Ga. 248, 250-251, 517 S.E.2d 511, 513-515 (1999) (discussing requirements of § 9-14-52 ). Much like certificates of appealability in federal court, Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003), a Georgia prisoner must establish in his application that at least one of his claims has "arguable merit." Ga. Sup.Ct. Rule 36. If he cannot, the Supreme Court of Georgia summarily denies relief by denying the certificate of probable cause. Ibid. ; see also § 9-14-52(b) ; Hittson v. GDCP Warden, 759 F.3d 1210, 1231-1232 (C.A.11 2014). If he can, then the court affords plenary review of the arguably meritorious claim. See, e.g., Sears v. Humphrey, 294 Ga. 117, 117-118, 751 S.E.2d 365, 368 (2013) ; Hillman v. Johnson, 297 Ga. 609, 611, 615, n. 5, 774 S.E.2d 615, 617, 620, n. 5 (2015). The most we can glean, therefore, from the summary denial of Foster's state habeas petition is that the Supreme Court of Georgia concluded that Foster's claim lacked "arguable merit."
The most obvious ground for deciding that Foster's claim lacked "arguable merit" is that the Supreme Court of Georgia already considered that claim and rejected it decades ago.[1] Georgia law prohibits Foster from raising the same claim anew in his state habeas petition. See, e.g., Davis v. Thomas, 261 Ga. 687, 689, 410 S.E.2d 110, 112 (1991). "It is axiomatic" in the Georgia courts "that a habeas court is not to be used as a substitute for an appeal, or as a second appeal." Walker v. Penn, 271 Ga. 609, 612, 523 S.E.2d 325, 327 (1999). Without such procedural bars, state prisoners could raise old claims again and again until they are declared victorious, and finality would mean nothing.
*1763 See Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 145 (1970) ("The proverbial man from Mars would surely think we must consider our system of criminal justice terribly bad if we are willing to tolerate such efforts at undoing judgments of conviction").
I would think that this state-law defect in Foster's state habeas petition would be the end of the matter: "Because this Court has no power to review a state law determination that is sufficient to support the judgment, resolution of any independent federal ground for the decision could not affect the judgment and would therefore be advisory." Coleman v. Thompson, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). It is fundamental that this Court's "only power over state judgments is to correct them to the extent that they incorrectly adjudge federal rights." Herb v. Pitcairn, 324 U.S. 117, 125-126, 65 S.Ct. 459, 89 L.Ed. 789 (1945). If an adequate and independent state-law ground bars Foster's claim, then the Court today has done nothing more than issue an impermissible advisory opinion.
B
To assure itself of jurisdiction, the Court wrongly assumes that the one-line order before us implicates a federal question. See ante, at 1745 - 1746. The lurking state-law procedural bar, according to the Court, is not an independent state-law ground because it "depends on a federal constitutional ruling." Ante, at 1746 (internal quotation marks omitted).
I would not so hastily assume that the State Supreme Court's unelaborated order depends on the resolution of a federal question without first seeking clarification from the Supreme Court of Georgia. To be sure, we often presume that a "state court decide[s] the case the way it did because it believed that federal law required it to do so." Long, 463 U.S., at 1040-1041, 103 S.Ct. 3469. But there still exist "certain circumstances in which clarification [from the state court] is necessary or desirable" before delving into the merits of a state court's decision. Id., at 1041, n. 6, 103 S.Ct. 3469.
This case presents such a circumstance. The Long presumption assumes that the ambiguous state-court ruling will come in the form of a reasoned decision: It applies in cases in which "it is not clear from the opinion itself that the state court relied upon an adequate and independent state ground and when it fairly appears that the state court rested its decision primarily on federal law." Id., at 1042, 103 S.Ct. 3469 (emphasis added). But here, when the decision is a one-line judgment, it hardly makes sense to invoke the Long presumption. There is neither an "opinion" nor any resolution of federal law that "fairly appears" on the face of the unexplained order. Ibid.
Confronted with cases like this in the past, this Court has vacated and remanded for clarification from the state court before proceeding to decide the merits of the underlying claim. I would follow that path instead of assuming that the one-line order implicates a federal question. We have "decline[d] ... to review the federal questions asserted to be present" when " 'there is considerable uncertainty as to the precise grounds for the [state court's] decision.' " Bush v. Palm Beach County Canvassing Bd., 531 U.S. 70, 78, 121 S.Ct. 471, 148 L.Ed.2d 366 (2000) (per curiam ) (quoting Minnesota v. National Tea Co., 309 U.S. 551, 555, 60 S.Ct. 676, 84 L.Ed. 920 (1940) ). A fortiori, when a State's highest court has denied relief without any explanation, the proper course is to vacate and remand for clarification before reaching the merits of a federal question that might have nothing to do with the state court's decision. See, e.g., Capital Cities *1764 Media, Inc. v. Toole, 466 U.S. 378, 104 S.Ct. 2144, 80 L.Ed.2d 378 (1984) (per curiam ); see also, e.g., Johnson v. Risk, 137 U.S. 300, 306-307, 11 S.Ct. 111, 34 L.Ed. 683 (1890). This course respects weighty federalism concerns. "It is fundamental that state courts be left free and unfettered by us" in interpreting their own law, National Tea Co., supra, at 557, 60 S.Ct. 676 especially when a state prisoner's long-final conviction is at stake.
Clarification is especially warranted here. Nothing in the reported decisions of the Supreme Court of Georgia suggests that federal law figures in how Georgia applies its res judicata procedural bar. Those decisions state that "new law or new facts" could "justify the reconsideration of the claims ... raised on direct appeal," Hall v. Lance, 286 Ga. 365, 376-377, 687 S.E.2d 809, 818 (2010), as might a showing that the prisoner is actually innocent, Walker, supra, at 611, 523 S.E.2d, at 327. But it is for the Supreme Court of Georgia-not this Court-to decide what new facts suffice to reopen a claim already decided against a state habeas petitioner. It is up to the Georgia courts, for example, to decide whether a petitioner was diligent in discovering those new facts, see, e.g., Gibson v. Head, 282 Ga. 156, 159, 646 S.E.2d 257, 260 (2007) (noting that whether a petitioner could overcome the procedural bar "depend[ed] on factual findings" including "the precise timing of [his] discovery of" the new evidence), or whether the new facts are "material," Rollf v. Carter, 298 Ga. 557, 558, 784 S.E.2d 341, 343 (2016).
Instead of leaving the application of Georgia law to the Georgia courts, the Court takes it upon itself to decide that the procedural bar implicates a federal question. Worse still, the Court surmises that Georgia's procedural bar depends on the resolution of a federal question by parsing the wrong court's decision, the opinion of the Superior Court of Butts County. Ante, at 1745 - 1746. Invoking Ake v. Oklahoma, 470 U.S. 68, 75, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the Court reasons that "the state habeas court's application of res judicata to Foster's Batson claim was not independent of the merits of his federal constitutional challenge." Ante, at 1746. (emphasis added). Accordingly, whether Foster has alleged a sufficient " 'change in the facts' " to overcome the Georgia procedural bar depends on whether Foster's Batson claim would succeed in light of those changed facts. Ante, at 1745 - 1746. But the State Superior Court's opinion is not the "judgmen[t] ... by the highest court of [Georgia] in which a decision could be had" subject to our certiorari jurisdiction. 28 U.S.C. § 1257. The unexplained denial of relief by the Supreme Court of Georgia is.
I cannot go along with the Court's decision to assure itself of its jurisdiction by attributing snippets of the State Superior Court's reasoning to the Supreme Court of Georgia. The reported decisions of the Supreme Court of Georgia do not resolve what "type of new alleged facts ... could ever warrant setting aside the procedural bar," Hall, supra, at 377, 687 S.E.2d, at 818, let alone intimate that a prisoner may relitigate a claim already decided against him merely because he might win this second time around. Cf. Roulain v. Martin, 266 Ga. 353, 354, 466 S.E.2d 837, 839 (1996) (opining that a state habeas court "would certainly be bound by the ruling [in the petitioner's direct appeal] regardless of whether that ruling may be erroneous"). I therefore refuse to presume that the unexplained denial of relief by the Supreme Court of Georgia presents a federal question.
*1765 [2]
The Court today imposes an opinion-writing requirement on the States' highest courts. Lest those high courts be subject to lengthy digressions on constitutional claims that might (or might not) be at issue, they must offer reasoned opinions why-after rejecting the same claim decades ago-they refuse to grant habeas relief now. But "[o]pinion-writing practices in state courts are influenced by considerations other than avoiding scrutiny by collateral attack in federal court," including "concentrat[ing their] resources on the cases where opinions are most needed." Harrington v. Richter, 562 U.S. 86, 99, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). Rather than demand detailed opinions of overburdened state courts, the Court should vacate and remand cases such as this one to assure itself of its jurisdiction.
II
The Court further errs by deciding that Foster's Batson claim has arguable merit. Because the adjudication of his Batson claim is, at bottom, a credibility determination, we owe "great deference" to the state court's initial finding that the prosecution's race-neutral reasons for striking veniremen Eddie Hood and Marilyn Garrett were credible. Batson, 476 U.S., at 98, n. 21, 106 S.Ct. 1712. On a record far less cold than today's, the Supreme Court of Georgia long ago (on direct appeal) rejected that claim by giving great deference to the trial court's credibility determinations. Evaluating the strike of venireman Hood, the court highlighted that his son had been convicted of a misdemeanor and that both his demeanor and religious affiliation indicated that he might be reluctant to impose the death penalty. Foster, 258 Ga., at 738, 374 S.E.2d, at 192. And the prosecution reasonably struck venireman Garrett, according to the court, because it feared that she would sympathize with Foster given her work with "low-income, underprivileged children" and because she was "related to someone with a drug or alcohol problem." Id., at 739, 374 S.E.2d, at 192. That should have been the last word on Foster's Batson claim.
But now, Foster has access to the prosecution's file. By allowing Foster to relitigate his Batson claim by bringing this newly discovered evidence to the fore, the Court upends Batson 's deferential framework. Foster's new evidence does not justify this Court's reassessment of who was telling the truth nearly three decades removed from voir dire .
A
The new evidence sets the tone for the Court's analysis, but a closer look reveals *1766 that it has limited probative value. For this reason, the Court's conclusion that the prosecution violated Batson rests mostly on arguments at Foster's disposal decades ago. See ante, at 1749 - 1751 (concluding that trial transcripts belie proffered reasons for striking Garrett); ante, at 1751 - 1754 (relying on transcripts and briefs as evidence of the prosecution's shifting explanations for striking Hood). The new evidence is no excuse for the Court's reversal of the state court's credibility determinations.
As even the Court admits, ante, at 1747 - 1748, we do not know who wrote most of the notes that Foster now relies upon as proof of the prosecutors' race-based motivations. We do know, however, that both prosecutors averred that they "did not make any of the highlighted marks on the jury venire list" and "did not instruct anyone to make the green highlighted marks." App. 168-169, 171. In particular, prosecutor Stephen Lanier reaffirmed his earlier testimony, given during Foster's hearing for a new trial, that he relied only on race-neutral factors in striking the jury. Id ., at 169; see also id ., at 80-125. And, prosecutor Douglas Pullen swore that he "did not rely on the highlighted jury venire list." Id ., at 171.
The hazy recollections of the prosecution's investigator, Clayton Lundy, are not to the contrary. As part of the postconviction proceedings, Lundy testified that he "[v]aguely" remembered parts of jury selection, he "kind of remember[ed]" some of the documents used during jury selection, and cautioned that he "ain't done this in a long time." Tr. 181-182. (When Lundy testified in 2006, nearly 20 years had passed since Foster's trial and he had changed careers. Id ., at 174.) He thought others at the district attorney's office "probably" passed venire lists around the office and "guess[ed]" that everyone would make notations. Id ., at 182, 190.
As for the other documents in the prosecution's file, Lundy could not identify who authored any of them, with two exceptions.[3] First, Lundy said he prepared handwritten lists describing seven veniremen, including Garrett, but her race is not mentioned. See id ., at 205; App. 293-294. Second, Lundy "guess[ed]" that prosecutor Lanier suggested the handwritten edits to a draft of an affidavit that Lundy later submitted to the trial court. Tr. 203; see App. 343-347 (draft affidavit); id ., at 127-129 (final affidavit). The relevant edits suggested deleting two statements that, "solely [in Lundy's ] opinion, " prosecutors ought to pick Garrett "[i]f it comes down to having to pick one of the black jurors." Id ., at 345 (emphasis added). Perhaps this look inside the district attorney's office reveals that the office debated internally who would be the best black juror. Or perhaps it reveals only Lundy's personal thoughts about selecting black jurors, an "opinion" with which (we can "guess") Lanier disagreed.
The notion that this "newly discovered evidence" could warrant relitigation of a Batson claim is flabbergasting. In Batson cases, the "decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." Hernandez v. New York, 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)
*1767 (plurality opinion). And because "[t]here will seldom be much evidence bearing on that issue," "the best evidence often will be the demeanor of the attorney who exercises the challenge." Ibid. Time and again, we have said that the credibility of the attorney is best judged by the trial court and can be overturned only if it is clearly erroneous. See ibid. ; see also Snyder v. Louisiana, 552 U.S. 472, 477, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008) ; Miller-El, 537 U.S., at 339, 123 S.Ct. 1029 ; Hernandez, supra, at 375, 111 S.Ct. 1859 (O'Connor, J., concurring in judgment).
But the Court today invites state prisoners to go searching for new "evidence" by demanding the files of the prosecutors who long ago convicted them. If those prisoners succeed, then apparently this Court's doors are open to conduct the credibility determination anew. Alas, "every end is instead a new beginning" for a majority of this Court. Welch v. United States, ---U.S. ----, ----, 136 S.Ct. 1257, 1276, --- L.Ed.2d ---- (2016) (THOMAS, J., dissenting). I cannot go along with that "sort of sandbagging of state courts." Miller-El v. Dretke, 545 U.S. 231, 279, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (THOMAS, J., dissenting). New evidence should not justify the relitigation of Batson claims.
B
Perhaps the Court's decision to reconsider a decades-old Batson claim based on newly discovered evidence would be less alarming if the new evidence revealed that the trial court had misjudged the prosecutors' reasons for striking Garrett and Hood. It does not. Not only is the probative value of the evidence severely limited, supra, at 1765 - 1767, but also pieces of the new evidence corroborate the trial court's conclusion that the race-neutral reasons were valid. The Court's substitution of its judgment for the trial court's credibility determinations is flawed both as a legal and factual matter.
1
The Court's analysis with respect to Hood is unavailing. The Court first compares Hood with other jurors who had similarly aged children, ante, at 1751 - 1752, just as the trial court did decades ago, App. 135-136. The trial court was well aware that Hood's son's conviction was for theft, not murder. But in the words of the trial court, "the conviction is a distinction that makes the difference" between Hood and the other jurors, and the prosecution's "apprehension that this would tend to, perhaps only subconsciously, make the venireman sympathetic to [Foster] was a rational one." Ibid. Because "the trial court believe[d] the prosecutor's nonracial justification, and that finding is not clearly erroneous, that [should be] the end of the matter." Hernandez, supra, at 375, 111 S.Ct. 1859 (O'Connor, J., concurring in judgment).
The Court also second-guesses the prosecution's strike of Hood because of his questionable stance on the death penalty. The Court concludes that Hood's transcribed statements at voir dire "unequivocally voiced [Hood's] willingness to impose the death penalty." Ante, at 1754. There is nothing unequivocal about a decades-old record. Our case law requires the Court to defer to the trial court's finding that the State's race-neutral concerns about Hood's "soft-spoken[ness] and slow[ness] in responding to the death penalty questions" were "credible." App. 138; see Snyder, supra, at 477, 128 S.Ct. 1203 ("[R]ace-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention), making the trial court's firsthand observations of even greater importance"). The "evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly *1768 within a trial judge's province." Hernandez, supra, at 365, 111 S.Ct. 1859 (plurality opinion) (internal quotation marks omitted).
The new evidence, moreover, supports the prosecution's concern about Hood's views on capital punishment. A handwritten document in the prosecution's file stated that the Church of Christ "doesn't take a stand on [the] Death Penalty." App. 302. Perplexingly, the Court considers this proof that the prosecution misled the trial court about its reasons for striking Hood. Ante, at 1752 - 1754. Hardly. That document further states that capital punishment is an issue "left for each individual member," App. 302, and thus in no way discredits the prosecutor's statement that, in his experience, "Church of Christ people, while they may not take a formal stand against the death penalty, ... are very, very reluctant to vote for the death penalty." Id ., at 84. And other notes in the file say that Hood gave "slow D[eath] P[enalty] answers" and that he "hesitated ... when asked about [the] D[eath] P [enalty]." Id., at 295, 303. This new evidence supports the prosecution's stated reason for striking Hood-that he, as a member of the Church of Christ, had taken an uncertain stance on capital punishment.
2
Likewise, the Court's evaluation of the strike of Garrett is riddled with error. The Court is vexed by a single misrepresentation about the prosecution's decision to strike Garrett-the prosecution stated that Garrett was listed as " 'questionable' " but the new evidence reveals that Garrett was on the " 'definite NO's' " list from the beginning. Ante, at 1749 - 1750. But whether the prosecution planned to strike Garrett all along or only at the last minute seems irrelevant to the more than 10 race-neutral reasons the prosecution supplied for striking Garrett.
The prosecution feared that Garrett might sympathize with Foster at sentencing. She worked with disadvantaged children, she was young, and she failed to disclose that her cousin had been recently arrested. See App. 55-57, 105. And prosecutors were concerned that she gave short answers, appeared nervous, and did not ask to be off the jury even though she was a divorced mother of two children and worked more than 70 hours per week. See id., at 55-56, 93-94. The prosecution also stated repeatedly that they were concerned about female jurors, who "appear to be more sympathetic ... in ... death penalty case[s] than men." Id ., at 42; see id., at 57.[4]
Pieces of the new evidence support some of these concerns. The notes in the prosecutors' file reveal that someone on the prosecution team was aware that Garrett's cousin was Angela Garrett (who had been arrested for drug-related charges and fired from her job on the eve of trial, id ., at 105, 129 ), that Garrett "would not look a[t] [the] C[our]t during V[oir] D[ire]," that she gave "very short answers," and that she "[l]ooked @ floor during D[eath] P [enalty]" questioning. Id ., at 293, 308.
Nevertheless, the Court frets that these indisputably race-neutral reasons were pretextual. The Court engages in its own comparison of the jurors to highlight the prosecution's refusal to strike white jurors with similar characteristics. Ante, at 1749 - 1751. But as with venireman Hood, the Georgia courts were faced with the same contentions regarding Garrett decades *1769 ago, and the Supreme Court of Georgia rightly decided that the trial court's findings were worthy of deference. After conducting a post-trial hearing in which one of the prosecutors testified, App. 80-125, the trial court credited the prosecution's concerns. The trial court, for example, agreed that Garrett's association with Head Start might be troubling and "believe[d] that the state [was] honest in voicing its concern that the combination of holding down two jobs and being the divorced mother of two indicates a less stable home environment," which "was the prime defense in [Foster's] case." Id ., at 142 ; see id., at 141. Again, that should be "the end of the matter." Hernandez, 500 U.S., at 375, 111 S.Ct. 1859 (O'Connor, J., concurring in judgment).
* * *
Today, without first seeking clarification from Georgia's highest court that it decided a federal question, the Court affords a death-row inmate another opportunity to relitigate his long-final conviction. In few other circumstances could I imagine the Court spilling so much ink over a factbound claim arising from a state postconviction proceeding. It was the trial court that observed the veniremen firsthand and heard them answer the prosecution's questions, and its evaluation of the prosecution's credibility on this point is certainly far better than this Court's nearly 30 years later. See Hernandez, supra, at 365, 111 S.Ct. 1859 (plurality opinion). I respectfully dissent.

Nor did his petition for rehearing, which was also denied. Foster v. Georgia, 492 U.S. 928, 109 S.Ct. 3269, 106 L.Ed.2d 613 (1989).

See Zant v. Foster, 261 Ga. 450, 406 S.E.2d 74 (1991) ; Foster v. State, 272 Ga. 69, 525 S.E.2d 78 (2000).

See Foster v. Georgia, 503 U.S. 921, 112 S.Ct. 1297, 117 L.Ed.2d 519 (1992) ; Foster v. Georgia, 531 U.S. 890, 121 S.Ct. 214, 148 L.Ed.2d 151, reh'g denied, 531 U.S. 1045, 121 S.Ct. 646, 148 L.Ed.2d 551 (2000).

Georgia res judicata law may also include a "miscarriage of justice" exception, but that appears to capture only the exceptionally rare claim of actual innocence, and so is not at issue here. See Walker v. Penn, 271 Ga. 609, 611, 523 S.E.2d 325, 327 (1999) ("The term miscarriage of justice is by no means to be deemed synonymous with procedural irregularity, or even with reversible error. To the contrary, it demands a much greater substance, approaching perhaps the imprisonment of one who, not only is not guilty of the specific offense for which he is convicted, but, further, is not even culpable in the circumstances under inquiry. (A plain example is a case of mistaken identity)" (brackets omitted)).